## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

REGENCY, INC., KELLY WOLFE,
SCHUYLER POPPE,  MICHELLE
KOEHLINGER, FRANZ "LJ"
HILBERATH, PATSY TRUGLIA,
CHRISTINE TRUGLIA, JOEL
RUFUS FRENCH, LATEESE FORD,
AND R&L SENIOR MARKETING
a/k/a R&L MARKETING GROUP
LLC, AARON WILLIAMSKY,
NADIA LEVIT, and STAR MEDICAL
SUPPLY,

    Defendants.

_____/

Case No. _____

**FILED *EX PARTE*
AND UNDER SEAL**

## UNITED STATES' *EX PARTE* COMPLAINT FOR
## TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff, the United States of America, by and through the undersigned

counsel, files this Complaint for Temporary Restraining Order and Preliminary and

Permanent Injunction, and alleges as follows:

1

## JURISDICTION AND VENUE

1.     The United States brings this action for a temporary restraining order, preliminary and permanent injunction, and other equitable relief pursuant to 18 U.S.C. § 1345.

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

3.     This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants either reside in this District or transact business in this District, and because a sizable portion of Defendants' actions that gave rise to this case occurred in this District.

## PARTIES

4.     Plaintiff is the United States of America.  At all times material to this action, the Department of Health and Human Services ("HHS") was an agency and instrumentality of the United States, and the Centers for Medicare and Medicaid ("CMS") was the component agency of HHS that administers and supervises the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, ("Medicare Program").

5.     Defendant Regency, Inc. ("REGENCY") is a Florida corporation, with its principal place of business at 1301 Seminole Blvd., Suite 112, Largo, Florida, which is within the Middle District of Florida. REGENCY also maintains operations in the Chattanooga-area of Tennessee.

2

6. Defendant Kelly Wolfe ("WOLFE") resides in this District, and owns and operates REGENCY. WOLFE conspired with key associates at REGENCY to establish and to help operate numerous DME supply companies – or, rather, DME "fronts" – throughout the Middle District of Florida and elsewhere. WOLFE established these DME fronts as a means to submit numerous fraudulent – and lucrative – DME claims to Medicare.

7. Defendant Schuyler Poppe (aka "Schuyler St. John") ("POPPE") resides in this District, and is a co-conspirator with WOLFE and REGENCY.

8. Defendant Michelle Koehlinger ("KOEHLINGER") resides in this District and is a manager of REGENCY.

9. Defendant Franz "LJ" Hilberath ("HILBERATH") resides in this District and is a manager of REGENCY.

10. WOLFE, POPPE, KOEHLINGER, and HILBERATH are collectively referred to herein as "the Regency conspirators."

11. The Regency conspirators established numerous DME fronts in Florida and elsewhere, on behalf of the Defendants and other non-party conspirators, as discussed herein.

12. Defendant Patsy J. Truglia ("PATSY TRUGLIA") is a resident of Parkland, Florida. PATSY TRUGLIA controls and owns multiple fraudulent DME fronts, which, in the public record, are consistently placed in his wife's name, Defendant CHRISTINE TRUGLIA, who also resides in Parkland, Florida. (CHRISTINE TRUGLIA and PATSY TRUGLIA are collectively referred to herein

3

as the "TRUGLIAs").  The Regency Conspirators established DME fronts for

PATSY TRUGLIA in the Middle District of Florida and elsewhere, including:

| DME Front Name | Medicare ID | Reported Address |
|---|---|---|
| Cordial Medical Supply, Inc. | 7714870001 | 2435 US Highway 19, Suite 135<br>Holiday, FL  34691 |
| Indian Shores Bracing, Inc. | 7681610001 | 19823 Gulf Boulevard, Suite A<br>Indian Shores, FL 33785 |
| Self-Care Bracing, Inc. | 7690030001 | 18350 NW 2nd Ave., Suite 406D<br>Miami Gardens, FL 33169 |
| Village Medical Supply, Inc. | 7714230001 | 11380 66th St. North, Suite 138<br>Largo, FL 33773 |

13.    The TRUGLIAS also own multiple fraudulent "marketing"

companies, including Global One Medical Solutions, LLC ("Global One") and ASP

Marketing Group LLC ("ASP").  These "marketing" companies are involved in the

illegal creating and/or sale of "doctors' orders" to fraudulent DME fronts, which

violates federal anti-kickback laws and other criminal statutes.

14.    Defendant JOEL "RUFUS" FRENCH is a resident of Amory,

Mississippi.  Defendant LATEESE FORD's last known address was in Covington,

Georgia.  FRENCH and FORD also own DME fronts established and/or operated

by the Regency conspirators, including:

| DME Front Name | Medicare ID | Reported Address |
|---|---|---|
| Cherry Medical Supply | 7691160001 | 6148 Lee Hwy., Suite 116<br>Chattanooga, TN  37421 |
| Helpful Home Medical Supply, Inc. | 1982192225 | 99 NW 183rd St., Suite 205A<br>North Miami Beach, FL 33169 |

| Paradise Medical Solutions, LLC (f/k/a Paradise Medical Solutions, Inc.) | 1225526569 | 18350 NW 2nd Ave., Suite 404 Miami Gardens, FL 33169 |
|---|---|---|

15.    FRENCH and FORD also own a fraudulent "lead-generation" company known as R&L SENIOR MARKETING, INC. a/k/a R&L MARKETING GROUP, LLC ("R&L MARKETING"). FRENCH and FORD, thus, are at times referred to as the "R&L conspirators" herein. ("R" and "L" likely stands for their names, "RUFUS" and "LATEESE.") Defendant R&L MARKETING offers lead-generation services to DME fronts and fraudulent marketers in violation of federal anti-kickback laws and other criminal statutes. Notably, as detailed herein, REGENCY assisted R&L MARKETING in the strategic screening, or so-called "entitlement checks," of prospective patients for future DME claims. R&L MARKETING is located at 121 Main Street North, Suites A and B, Amory, MS 38821.

16.    Defendant AARON WILLIAMSKY and his main business partner Defendant NADIA LEVIT are residents of New Jersey and close associates of the Regency Conspirators and the Ever Prime conspirators, as further discussed below. WILLIAMSKY/LEVIT own and control their own fraudulent DME fronts, including ones that REGENCY established, such as:

| DME Front Name | Medicare ID | Reported Address |
|---|---|---|
| Ace Medical Supply, Inc. | 7667410001 | 14004 Roosevelt Blvd., Suite 610 Clearwater, FL 33762 |
| MKS Medical Supply, Inc. | 7666930001 | 801 W Bay Drive, Suite 307 Largo, FL 33770 |

| Franz Medical Supply | 7708790001 | 4707 140th Ave., N., Suite 307 Clearwater, FL  33762 |
|---|---|---|

17.    Defendant STAR MEDICAL SUPPLY ("STAR") is a DME front in Tennessee that was established by the Regency conspirators on behalf of the Ever Prime conspirators, and is discussed further below.  STAR's business address is publicly listed as 6802 Ringgold Rd, Suite 105, East Ridge, TN 37412.

18.    The Regency Conspirators, the TRUGLIAs, the R&L Conspirators, and WILLIAMSKY/LEVIT are involved in establishing fraudulent DME fronts based on false statements in enrollment documents, as well as the illegal creation and/or sale of "doctor's orders" to the fraudulent DME fronts, which violates federal anti-kickback laws and other criminal statutes.

**Other non-party conspirators**

19.    Defendants also conduct business with certain other individuals and companies, which are engaged in establishing fraudulent DME fronts by submitting false statements to Medicare, as well as creating and/or selling "doctor's orders" in violation of federal anti-kickback laws and other criminal statutes.

20.    The Regency conspirators have joined and combined with conspirators from a California company known as Ever Prime Concepts, Inc. ("Ever Prime"). The Ever Prime conspirators include Charles Burruss, Ardalaan "Armani" Adams, and others.  The Ever Prime conspirators operate a fraudulent network of affiliated DME fronts (the fraudulent "Ever Prime Network") which began in California. Beginning in or around 2017, the Regency conspirators partnered with Ever Prime to

expand its fraudulent DME network into the Middle District of Florida and beyond.
Since then, the Regency conspirators have routinely "sold" Ever Prime numerous
newly-established DME fronts immediately after each secured Medicare-billing
privileges. And, to avoid Medicare scrutiny (among other objectives), the Regency
conspirators covertly sold or transferred the DME fronts to Ever Prime's control
using sham transactions involving "straw" or "nominee" owners. After such sales,
WOLFE and the Regency conspirators remained integral, helping to maintain
Medicare billing rights for the DME fronts, a valuable service for which the Ever
Prime conspirators paid. The DME fronts in the fraudulent Ever Prime Network
include:

| DME Front Name | Medicare ID | Reported Address |
|---|---|---|
| Absolute Comfort Medical | 7703200001 | 11350 66th Street, North, Suite 107<br>Largo, FL 33773 |
| Advanced Medical Supply LLC | 7636320001 | 41530 Enterprise Circle South, Suite 201<br>Temecula, CA 92590<br>(formerly 1301 Seminole Boulevard,<br>Suite 142, Largo, FL 33770) |
| American Bracing Solutions Inc. | 7662740001 | 1301 Seminole Boulevard, Suite 141<br>Largo, FL 33770 |
| Back Braces Plus Inc. | 7653850001 | 9365 US Highway 19 North, Suite A<br>Pinellas Park, FL 33782 |
| Belle Oak Bracing, Inc. | 7698410001 | 3900 Belle Oak Blvd., Suite 101<br>Largo, FL 33771 |
| Bracing Partners, Inc. | 7661490001 | 9950 W Van Buren Street, Suite 115<br>Avondale, AZ 85323<br>(formerly 1301 Seminole Boulevard, Suite 115<br>Largo, FL 33770) |
| Campbell Medical Supply, Inc. | 7714020001 | 11350 66th Street, North, Suite 101<br>Largo, FL 33773 |
| Caring For Your Pain Bracing, Inc. | 7663950001 | 8800 49th Street North, Suite 209<br>Pinellas Park, FL 33782 |

| | | |
|---|---|---|
| CP Bracing Supply, Inc. | 7666130001 | 801 W Bay Drive, Suite 505<br>Largo, FL 33770 |
| Discovery Medical Supply Inc. | 7609580001 | 1301 Seminole Boulevard, Suite 117<br>Largo, FL 33770 |
| First Stop Medical Supply Inc. | 7666200001 | 8800 49th Street North, Suite 309<br>Pinellas Park, FL 33782 |
| Jackson Medical Supply, Inc. | 7673230001 | 801 W Bay Drive, Suite 515<br>Largo, FL 33770 |
| Layne Medical Supply Inc. | 7691340001 | 39047 County Road 54,<br>Zephyrhills, FL 33542 |
| LJH Medical Solutions, Inc. | 7666180001 | 801 W Bay Dr., Suite 504<br>Largo, FL 33770 |
| Lucky Medical Supply, Inc. | 7666990001 | 14004 Roosevelt Blvd, Suite 612<br>Clearwater, FL 37762 |
| Mainlands Medical, Inc. | 7707430001 | 9371 US Hwy 19 North, Suite D<br>Pinellas Park, FL |
| STAR MEDICAL SUPPLY | 7789610001 | 6802 Ringgold Rd., Suite 105<br>East Ridge, TN 37412 |
| Sunshine Medical Solutions | 7696110001 | 6148 Lee Hwy, Suite 203<br>Chattanooga, TN 37421 |
| Tree Top Medical Inc. | 7699030001 | 9365 US Hwy 19, North, Suite A2<br>Pinellas Park, FL 33782 |
| Wellness Medical Solutions Inc. | 7695070001 | 99 NW 183rd Street., Suite 224C4<br>N. Miami Beach, FL 33169 |
| Westside Medical Bracing, Inc. | 7691160001 | 39029 County Road 54,<br>Zephyrhills, FL 33542 |

21.     Ever Prime is not REGENCY's only "client" in the scheme.  Several other conspirators have also joined and combined with REGENCY to form fraudulent DME networks of their own, which engage in similar and/or related schemes to defraud Medicare.

22.    In addition, the United States has uncovered more information regarding the Ever Prime conspirators' relationships with certain other fraudulent "marketing" companies, which appear to be principally engaged in the business of creating and/or selling false and fraudulent doctor's orders in violation of 18 U.S.C. § 1035 and 18 U.S.C. § 1347, federal anti-kickback laws, and other criminal statutes. These so-called marketers include:

a.    SKF Enterprises LLC ("SKF"), which is which is located at 2435 U.S. Highway 19, North, Suite 200, Holiday, Florida 34691.  SKF is owned and operated by Samuel and Krystal Friedman of Land O' Lakes, Florida.  The Friedmans also briefly operated a joint venture—another fraudulent "marketing" company—with the Ever Prime conspirators and WILLIAMSKY: Kaska Enterprises, Inc.

b.    Unique Media Connections, d/b/a "Media Lead Kings" ("Unique"), which is located, according to corporate records, at 5019 Morris Avenue in Addison, Texas, and owned by Steven Parker.  Invoices and wire information for Unique, however, reflect that it does business at 4191 Whitley Place Drive in Prosper, Texas, which is Parker's known residence.  Unique and Parker conduct business in this District and are engaged in creating and/or selling "doctors' orders" in violation of federal anti-kickback laws and other criminal statutes.

c.    Cure Healthcare, Inc. ("Cure"), located at 4695 Mac Arthur Court, Suite 1100, in Newport Beach, California.  Cure conducts business in

this District and is engaged in creating and/or selling "doctors' orders" in violation of federal anti-kickback laws and other criminal statutes.

23.     As explained more fully below, Defendants and the non-party conspirators have engaged in a widespread kickback scheme relying on a constellation of lies and misrepresentations to Medicare and others, and have collectively stolen over $183 million from the Medicare Program as a result. The Defendants have conspired to violate, and have violated, numerous federal criminal laws, including 18 U.S.C. § 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and pay and receive kickbacks in connection with a federal health care benefit program), 18 U.S.C. § 1035 (making false statements relating to health care matters), 18 U.S.C. § 1001 (false statements), and 42 U.S.C. § 1320a-7b(b), also known as the "Anti-Kickback Statute" (paying and receiving illegal healthcare kickbacks).

### THE MEDICARE PROGRAM

24.     Medicare is a federal health care program providing benefits to persons who are 65 or older or disabled. Medicare is administered by HHS through its agency, CMS. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

25.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24.

26.     The Medicare program is divided into four "parts" that cover different services. "Part A" of the Medicare program covers certain health services provided by hospitals, skilled nursing facilities, home health services, and hospice care.

27.     "Part B" of the Medicare program covers, among other things, physician services, outpatient care, and certain medical supplies, including – at issue in this case – Durable Medical Equipment ("DME", sometimes referred to as "DMEPOS", which stands for Durable Medical Equipment, Prosthetics, Orthotics, and Supplies).

28.     DME (or DMEPOS) generally refers to equipment that provides a therapeutic benefit or enables a patient to perform tasks that he or she is otherwise unable to undertake.  DME examples relevant to this case include orthotic braces, such as back braces, knee braces, shoulder braces, and wrist braces.

29.     CMS defines orthotic braces as "rigid and semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."  Medicare Benefit Policy Manual, Pub. No. 100-02, chapter 15, § 130.

30.     To be paid by Medicare, a service or item must be reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.  42 U.S.C. § 1862(a)(1)(A).  For DME to be covered by Medicare, it must be prescribed for the specific beneficiary by a treating physician, nurse practitioner, physician assistant, or clinical nurse specialist.

## DME Supplier Enrollment Process

31.     Defendants have established numerous retail DME companies – or, for their unlawful purposes, DME fronts.  After an application and inspection process is complete, retail DME companies are eligible to participate in the Medicare program, including, to submit claims and to receive payments.

32.     Medicare Part B only covers DME provided by suppliers who are enrolled in Medicare, meaning the supplier has been approved by Medicare and has a Medicare supplier number.

33.     DME suppliers who wish to be eligible to participate in Medicare Part B must first obtain a National Provider Identifier ("NPI").   Once a NPI has been obtained, suppliers must complete the Medicare Enrollment Package via a CMS-855S form, in order to obtain a supplier number, which is also known as a Provider Transaction Access Number ("PTAN").  A supplier must have both an NPI and a PTAN in order to be eligible to receive Medicare payment for covered DME.

34.     The CMS-855S is a key step in the Medicare enrollment process for DME companies.  Defendants, as detailed herein, typically submitted or caused to be submitted false and fraudulent forms and supporting documentation to secure eligibility.  And they did so in defiance of the express warnings on the forms regarding criminal and civil penalties for lying to Medicare to gain or to maintain enrollment.

35.     The CMS-855S form explains the standards every Medicare DME supplier must meet in order to obtain and retain their billing privileges, and requires

that an authorized official certify the contents of the application and attest to meeting and maintaining certain requirements.

36.     The CMS-855S certification requires that the official "agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization." It also states that the official "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)[.]"

37.     The CMS-855S contains additional certifications that the supplier "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

38.     The CMS-855S form also calls for information about the "owners" and "managing employees" of the DME company. The term "owner" refers to any person (meaning individual and/or organizations) with at least a 5% stake in a DME company.

39.     Defendants concealed the ownership stakes of certain individuals in the fraudulent DME fronts created through REGENCY. These individual conspirators (including the Ever Prime conspirators, the R&L conspirators, the TRUGLIAS, and WILLIAMSKY/LEVIT) own and control their respective fraudulent networks of affiliated DME fronts, but their ownership stakes were strategically not disclosed on the Forms CMS-855S. Instead, the Regency

conspirators reported the names of straw or nominee owners on the form. By doing this, the Defendants, among other things, apparently sought to conceal certain individuals' involvement with the fronts, and to perpetuate the fraud.

40.    The term "managing employee" refers to any person—including a general manager, business manager, or administrator—who has operational or managerial control over the DME supplier, or who conducts the day-to-day operations of the DME supplier. For Medicare enrollment purposes, "managing employee" also includes individuals who are not necessarily "employees" of the DME supplier—meaning those who manage day-to-day operations as a contractor or through some other arrangement. This definition applies to the Ever Prime conspirators (Burruss and Adams) and others.

41.    This definition also applies to WOLFE, including based on her extensive email communications with the Ever Prime conspirators and others regarding ongoing management issues (*e.g.*, Medicare audits, personnel problems) at the DME fronts, even after her putative "sales" of the DME fronts to "straw" or "nominee" owners. WOLFE's continued oversight and assistance is also consistent with financial records, which show substantial payments to WOLFE, either directly or indirectly,[1] from the conspirators involved in these schemes.

42.    The Form CMS-855S also requires that the owners and managers (including organizations) disclose any and all reportable "Adverse Legal Actions,"

---

[1] According to financial records, some conspirators (*e.g.*, the Ever Prime conspirators, the R&L conspirators, the TRUGLIAS, and WILLIAMSKY/LEVIT) have paid WOLFE and/or POPPE using intermediaries, such as straw owners or through other entities or companies in their control.

which are specifically outlined on the form.  Reportable adverse actions include any

recent federal or state criminal convictions, any felony or misdemeanor conviction

relating to the unlawful sale or distribution of a controlled substance, as well as any

prior Medicare suspensions or revocations.

43.    Some of the key conspirators, including at least PATSY TRUGLIA

and Adams, whose ownership and/or managerial interests in various DME fronts

that were established through REGENCY were concealed from Medicare, are

believed to have reportable "Adverse Legal Actions," such as prior felony

convictions, in recent history.  This explains, in part, their reliance on "straw" or

"nominee" owners on the Form CMS-855S.

44.    Defendants, as detailed further below, made or conspired to make

various and material lies, omissions, and misrepresentations on CMS-855S forms

and in related interactions with Medicare to seek or maintain enrollment in the

Medicare program.  This conduct violates, among other statutes, 18 U.S.C. §§ 371,

1001, 1035, 1347, and 1349.

45.    Medicare regulations also define standards that DME suppliers must

meet to receive and to maintain their billing privileges.[2]  Those standards are

pertinently listed below:

       a.    A supplier must be in compliance with all applicable federal
            and state licensure and regulatory requirements;

---

[2] These standards, in their entirety, are listed in 42 C.F.R. § 424.57(c).

15

b.     A supplier must provide complete and accurate information on the DME supplier application. Any changes to this information must be reported to the NSC (National Supplier Clearinghouse) within 30 days;

c.     An authorized individual (one whose signature is binding) must sign the application for billing privileges;

d.     A supplier must fill orders from its own inventory, or must contract with other companies for the purchase of items necessary to fill the order;

e.     A supplier must maintain a physical facility on an appropriate site and must maintain a visible sign with posted hours of operation. The location must be accessible to the public and staffed during posted hours of business. The location must be at least 200 square feet and contain space for storing records;

f.     A supplier must permit CMS or its agents to conduct on-site inspections to ascertain the supplier's compliance with these standards;

g.     A supplier must maintain a primary business telephone listed under the name of the business in a local directory, or a toll-free number available through directory assistance. The exclusive use of a beeper, answering machine, answering service or cell phone during posted business hours is prohibited;

h.     A supplier is prohibited from direct solicitation to Medicare beneficiaries;

i.     A supplier is responsible for delivery and must instruct beneficiaries on use of Medicare covered items and maintain proof of delivery and beneficiary instruction;

j.     A supplier must disclose any person having ownership, financial or control interest in the supplier; and

k.     A supplier must not convey or reassign a supplier number (i.e., the supplier may not sell or allow another entity to use its Medicare billing number).

46.     Finally, CMS imposes restrictions on providers that seek to obtain multiple provider numbers. This practice is prohibited unless it is appropriate to identify subsidiaries or regional entities under the provider's ownership or control. This is critical here as the conspirators own multiple, affiliated DME fronts— meaning, for some, over 30 DME fronts.

### Electronic Funds Transfer ("EFT") Authorization Agreement

47.     DME Suppliers are also required to complete and submit an Authorization Agreement for Electronic Funds Transfer ("EFT"), Form CMS-588, during enrollment. The EFT form mainly seeks banking information (*e.g.*, account/routing number), which enables Medicare to pay claims electronically. The form also seeks contact information for the individual(s) who serve as the provider's contact and/or authorized representative.

### On-Site Inspection of DME Applicant

48.     The NSC also requires on-site inspections of DME providers to assess whether they comply with the supplier standards outlined above. Inspections are conducted for new applications, but can also occur after approval. The NSC considers the inspection results along with the Form CMS-855S (meaning the enrollment application) and supporting documentation – including critical supplier contracts for DME inventory – to determine eligibility. At the inspection, an authorized site inspector completes a form seeking, pertinently: (i) a list of all owners

and management with day-to-day control (including names and titles); and (ii) whether the owner or his relatives have owned other medical entities.

### Medicare Reimbursement for DME

49.     To assist in the administration of Medicare, CMS contracts with private insurance companies called Medicare Administrative Contractors ("MACs") to, among other things, process and pay individual Medicare claims on behalf of CMS, as well as perform administrative functions on a regional level. Currently, CMS contracts with two MACs that specifically process DME (or DMEPOS) claims under Medicare Part B.

50.     Suppliers – meaning, as detailed above, properly credentialed and authorized DME providers – must submit claims to the DME MAC that serves the state or territory where the Medicare beneficiary permanently resides. The DME MAC that is responsible for Region C, which includes the state of Florida, is Cigna Government Services Administrators, LLC ("CGS"), headquartered in Nashville, Tennessee.

51.     CMS also contracts with Palmetto GBA, which is the National Supplier Clearinghouse ("NSC") MAC and is the single entity responsible for issuing or revoking Medicare supplier billing privileges for DME suppliers.

52.     The DME MACs develop local coverage determinations ("LCDs")[3] for some covered orthotic braces. The LCDs outline the conditions under which

---

[3] An LCD is a decision by a Medicare contractor, such as a DME MAC, whether to cover a particular item or service on a contractor-wide basis in accordance with section 1862(a)(1)(A) of the Social Security Act. *See* the Social Security Act, 42 U.S.C. at § 1869(f)(2)(B).

DME MACs will pay suppliers for those braces.  Before submitting a claim for an orthotic brace to the DME MAC, a supplier must have on file the following:[4]

    a.    written documentation of a verbal order or a preliminary written order from a treating physician;[5]

    b.    a detailed written order from the treating physician;

    c.    information from the treating physician concerning the beneficiary's diagnosis;

    d.    any information required for the use of specific modifiers[6]; and

    e.    proof of delivery of the orthotic brace to the beneficiary.

53.    In summary, the proper process to prescribe, deliver, and then bill Medicare for DME products is as follows: After an examination, the physician writes a prescription for the beneficiary.  This prescription will contain the patient's identifying information, the DME item that the physician believes is medically necessary for treatment, and the alphanumeric diagnosis code(s) for the DME item.  Absent a valid prescription or other certification by the treating physician, Medicare lacks the statutory authority to pay the claim.  *See* 42 U.S.C. §§ 1395n(a)(2)(b), 1395y(a)(1) ("[N]o payment may be made...for any expenses incurred for

---

[4] CMS's Medicare Program Integrity Manual, Pub. No. 100-08 (the Manual), chapter 5, §§ 5.2.2 and 5.8(A), (B), and (D).

[5] CMS defines "physician" to include various practitioners authorized to practice in the state where he performs those functions, including, for example, Physician Assistant, Nurse Practitioner, and Clinical Nurse Specialist.

[6] A modifier is a two-digit code that further describes the service or supply for which reimbursement is sought, such as indicating the limb affected.

items…which are not reasonable and necessary for the diagnosis or treatment of illness or injury.").

54.     The prescription is, in turn, presented to a DME company, whereupon the DME company provides the necessary equipment to the patient.  The DME company then directly submits a claim to Medicare through the appropriate DME MAC, or sends a request for payment to a billing service, which in turn files the claim with Medicare through the DME MAC.

55.     Medicare Part B generally reimburses 80 percent of the allowable charge for medically necessary services or supplies provided to Medicare beneficiaries.  Such services or supplies are submitted for payment to the MAC on either a "Health Insurance Claim Form" (meaning the "CMS Form 1500"), or through an "Electronic Media Claims" ("EMC") system, which electronically transmits the information on a CMS Form 1500.

56.     A DME claim must contain certain information relating to a specific patient or beneficiary on the CMS Form 1500, including:

    a.     the type of service provided, identified through a coding system referred to as a Healthcare Common Procedure Coding System ("HCPCS");

    b.     the date of service or supply;

    c.     the referring physician's NPI;

    d.     the charge for such services;

    e.     the patient's diagnosis;

    f.     the NPI associated with the entity seeking reimbursement; and

g.   a certification by the DME provider that the supplies are medically necessary.

57.   When submitting claims to DME MACs for orthotic braces, suppliers use HCPCS codes.[7]  Under Medicare Part B, the MACs reimburse DME suppliers for orthotic braces—such as, pertinently, back, knee, shoulder, and wrist braces—based on a fee schedule.

58.   When submitting a Form CMS-1500, the provider must also certify the completeness and accuracy of the information reported on the form.  Providers are further advised that "anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

59.   Providers must also certify information on the reverse side of the claim.  Specifically, the February 2012 version of the Form CMS-1500[8] contains an additional certification representing that the claim complies with applicable Medicare laws and regulations, including the anti-kickback statute.

## THE DEFENDANTS' FRAUDULENT CONDUCT

60.   Defendants have joined and combined with others to defraud the United States by impeding, impairing, obstructing, and defeating the lawful function

---

[7]  HCPCS codes are used throughout the healthcare industry to standardize coding for medical procedures, services, products, and supplies.

[8]  Required as of April 2014.

of HHS in its operation, supervision, and administration of the Medicare Health Insurance Program.

61.     Defendants have submitted or caused to be submitted false and fraudulent enrollment documents to Medicare to establish and/or to maintain numerous fraudulent DME fronts in the Middle District of Florida and elsewhere. The enrollment applications, meaning the "Form CMS-855S," concealed and misrepresented the identities of the true owners/managers who, in fact, control the fraudulent DME fronts. The true or *de facto* owners/managers of the DME fronts include, among others, the Ever Prime conspirators, the R&L conspirators, PATSY TRUGLIA, WILLIAMSKY, and LEVIT. Their identities were strategically concealed, including by, among other means, falsely and fraudulently reporting to Medicare the names of "straw" or "nominee" owners.

62.     The Regency conspirators and others submitted or caused to be submitted false information to inspectors and other representatives who conducted critical on-site inspections at the DME fronts on behalf of Medicare. Such false information included, notably, the presentation of fake patient files as well as other false documents during the inspection process. This subterfuge, as detailed later, facilitated Medicare's approval of the DME fronts.

63.     The fraudulent DME suppliers created and maintained by the Defendants are violating the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), as well as a host of other federal statutes (e.g. 18 U.S.C. §§ 1001, 1035, and 1347), by paying illegal kickbacks for packaged doctors' orders, or "leads," as

22

discussed further below, and submitting claims tainted by these kickbacks to Medicare.

64.     The co-conspirators Cure, Unique, SKF, and Global One are so-called "marketing" companies engaged in the illegal creation and/or sale of "leads" or "doctors' orders" to DME fronts. These "marketers" created, sold, and/or conveyed "doctors' orders" to DME fronts—including to affiliated DME fronts within fraudulent networks discussed herein—in violation of federal anti-kickback laws and other criminal statutes.

65.     After the DME fronts illegally obtained the "doctors' orders," they, in turn, submitted, or caused to be submitted, claims based on these "orders" to Medicare for reimbursement. The conspirators did so even if the DME products lacked medical necessity; they did so even, at times, when the DME products were never even delivered to the Medicare beneficiary.

### Anatomy of a Fraud: Information from Cooperating Source 1 ("CS-1") And Overview of Nationwide Scheme

66.     The Ever Prime conspirators along with their close associates, WILLIAMSKY, and LEVIT, have purchased "leads" or "doctor's orders" from a fraudulent "marketing" company in the Philippines. That company is known as "Chronos," and, approximately eight months ago, one of its owners became a cooperating source ("CS-1") in this multidistrict investigation.

67.     CS-1 controls and operates a fraudulent telemarketing enterprise. This enterprise plays an integral role in a broad, nationwide and international conspiracy

to submit false claims to Medicare for durable medical equipment or "DME,"

meaning orthoses, such as back braces, knee braces, and similar equipment.

68.     CS-1's call centers in the Philippines harvest information from

Medicare beneficiaries and, using "telemedicine," package completed "doctors'

orders" are sold to fraudulent DME fronts, which, in turn, submit the "claims" to

Medicare for payment.  This, as even CS-1 has admitted, is illegal.

69.     CS-1 has explained the operations and structure of his fraudulent

telemarketing enterprise, described the process for developing and submitting

fraudulent DME claims to Medicare, listed some of the different types of participants

integral to the execution of this scheme, and, then, specifically identified some of the

individuals and entities who have actively participated (and still participate) in this

scheme.  In short, CS-1 has provided the playbook and a partial roster for this wide-

ranging scheme to defraud Medicare.

70.     Regarding this proverbial roster: CS-1 has provided two separate lists

with information about numerous fraudulent DME fronts operating throughout the

United States.  That information includes, where readily available, the identities of

the fraudulent DME companies' *de facto* owners—meaning the true

owners/managers of the fraudulent companies, rather than the straw owners (or

nominee owners) whose names and identities are often used on corporate, public,

and government-facing documents.  CS-1 has also provided billing addresses and

other information about the DME fronts.  Combined, the lists from CS-1 reflect

nearly 80 fraudulent DME companies, 34 of which are owned or operated by the

Ever Prime[9] conspirators and other known associates. Of these fronts, over a dozen are "operating"—meaning processing and submitting fraudulent claims to Medicare—in the Middle District of Florida and elsewhere.

71.     CS-1 is also actively cooperating in other ways, including through the voluntary production of information and business records, consensual searches of electronic-format business records, and engaging in consensual monitoring of other targets and subjects for and at the direction of law-enforcement agents. These efforts have unfolded in multiple districts, including, for example, in New Jersey, South Carolina, Las Vegas, San Diego, and in the Middle District of Florida.

72.     Pertinent aspects of CS-1's interviews with law-enforcement agents from HHS-OIG and the FBI are detailed below.

### CS-1's Telemarketing Ventures in the Philippines

73.     CS-1's formation of telemarketing ventures known as "Pantheon" and "Chronos" in the Philippines figures importantly in the scheme. Some background is warranted: In or about 2013, CS-1 owned and operated a Philippines-based marketing and telemarketing company called Pantheon Concepts ("Pantheon"). Pantheon targeted Medicare patients through focused television and internet advertising for DME products. Pantheon's marketing tools invited Medicare

---

[9] Though CS-1 was unfamiliar with the "Ever Prime" moniker, he was self-evidently familiar with the conspirators, associates, and DME fronts within the Ever Prime network. Thus, while CS-1 may not know the "Ever Prime" label, he is familiar with—and has even visited—Ever Prime's actual headquarters in San Diego, California, which CS-1 positively identified during an interview.

patients to contact its call centers to receive free (or practically free) DME products, such as, back braces, knee braces, and similar orthoses.

74.    After fielding callers, and vetting their Medicare information, Pantheon apparently sold the information to domestic DME companies as packaged doctors' orders—sometimes called "DOs" within this fraudulent scheme. The then-going price for a doctor's order was approximately $75 to $125. In or about December 2013, Filipino authorities arrested CS-1 and his associates. The resolution (if any) of this matter is unclear, but CS-1 was eventually released from custody.

75.    In or about March 2014, CS-1 then formed Chronos Strategies ("Chronos") with other investors. Chronos, like Pantheon, principally engaged in the fraudulent packaging of doctor's orders through telemarketing. In summary, Chronos runs a call center, which verifies Medicare eligibility and insurance information for callers/prospective patients. Once the information is verified, callers are typically paired with select telemedicine companies willing to do business with Chronos. Chronos, even during the pendency of this federal investigation, remains operational; it continues to provide services to the fraudulent DME companies, including, pertinently, Regency-established affiliates within the fraudulent Ever Prime Network.

### CS-1's Chronos Business Operations

76.    Between in or about November 2017 through in or about August 2018, CS-1 claims to have grossed about $72 million through Chronos. CS-1 has well over

500 employees.  The sales staff, including those who handle telemarketing, work on rotations, such that Chronos operates 24 hours a day, seven days a week.

77.   CS-1 explained that approximately 250 of his employees are considered "fronters."  The fronters, collectively, work around-the-clock.  Fronters field inbound phone calls from prospective patients.  The calls originate, in part, from advertising (mainly mailings, television ads, and the internet).  Fronters are tasked to collect key information from the callers/prospective patients: was the caller inquiring about a brace, what is the caller's name and date of birth, and did he have a Medicare ID number.  The Medicare ID number would then be verified through third-party vendors.  CS-1 claims that his company currently receives over 40,000 calls per week, with approximately 10% of those callers "qualifying," meaning, seemingly, for the submission of a DME claim to Medicare.

78.   CS-1 also explained that about 80 employees are considered "chasers." These employees principally "chase" doctors.  The chasers also perform other critical tasks for the fraudulent packaging of doctor's orders or "leads."  Those tasks generally include handling patient intake, verifying the patient's Medicare eligibility, confirming that the patient wants a brace (or braces), and determining whether a patient wanted to use her primary physician or a telemedicine physician.

79.   If a "prospective patient" wanted to use her own physician, the chaser would then dial-in the doctor.  Subsequently, the chaser would follow-up with the doctor to complete the order.  But, for patients requesting telemedicine, the call would be transferred to a third-party vendor—including, for a time in the company's

history, "ProCall," whose representatives are believed to be in South America.[10]  No follow-up was conducted as to telemedicine orders.  CS-1 recalled substantially more success—meaning, it appears, doctors' orders—through telemedicine.  He also recalled that many "prospective patients" (about 80%) opted to use telemedicine.

### "Up-Selling" to Prospective Patients

80.    During the lead generation phase, call center employees were directed to "up-sell" braces to all Medicare beneficiaries.  "Up-selling"—particularly when it involves supplies ultimately paid for by Medicare—is an abusive marketing practice that promotes medically unnecessary supplies.

81.    CS-1 acknowledged the company's once ideal expectation for "up-selling": they called it the "Iron Man Kit."  The "Iron Man Kit" referred to a Medicare patient who would agree that she needed two wrist braces, two arm/shoulder braces, two knee braces, and one back brace.  CS-1 eventually directed employees to stop at three brace orders per beneficiary to avoid Medicare scrutiny.

82.    For call center employees who did not successfully "up-sell," CS-1 increased training or, at times, fired the bottom 20%, meaning the "underproducers."

83.    The "up-selling" standards observed at CS-1's company show a conscious disregard for medical necessity.  This further supports probable cause to believe that CS-1 and his DME clients, including Defendants WILLIAMSKY/LEVIT and the Ever Prime Conspirators, submitted and caused to

---

[10] CS-1 recalled using several other telemedicine companies.  Those companies handled these transactions differently.  The doctor's orders were posted on a portal; the patient, in turn, would provide times for when a telephysician could theoretically call her.

be submitted fraudulent claims to the Medicare program in violation of 18 U.S.C. § 1347.

## Questionable Telemedicine Partners

84.     Regardless of the abusive and illegal marketing practices employed by CS-1, physicians can and *should* act as gate keepers on behalf of the Medicare program.  The fraudulent scheme described herein cannot be fully successful unless a physician orders the DME products after a supposed evaluation of the patient.  As detailed later, however, claims data and beneficiary interviews strongly suggest that many referring physicians appear to be complicit with the overall fraudulent scheme of prescribing medically unnecessary DME.

85.     Facts gathered from CS-1's interviews further support this assertion.  First, as previously noted, CS-1 observed a substantially higher rate of success when patients requested "telemedicine" doctors rather than their primary care physicians. Further, CS-1 tracked these interactions and found that, on average, telemedicine doctors out-prescribed primary care physicians.  The average telemedicine order resulted in 2.3 braces per patient, as compared to an average 1.4 braces per patient for primary care physicians.

## DME Order Processing and "Drop-Shipping"

86.     After the fronters and chasers developed the above-referenced patient leads, CS-1's company would process and finalize DME orders.  This is where the company's "coders" came into play.  Coders handle data entry and, importantly, upload the doctors' orders.  The data entry triggered a series of events, including, for

example, drop-shipping DME products to the patient and later compiling the necessary information into a medium that domestic DME companies could purchase to submit to Medicare for payment.

87.    Drop-shipping is the direct delivery of warehoused DME products to patients. CS-1 used several different domestic vendors for drop-shipping, including three companies in which he is a material investor (*i.e.*, Bentley, JacMart, and Cruz). Some DME products (including, chiefly, knee braces) were drop-shipped by a fourth company, Comfortland. Bank records for the several DME-front networks, including (but not limited to) the Ever Prime and WILLIAMSKY/LEVIT Networks, show reliance on the same drop-shipping companies that CS-1 had identified for agents.

88.    CS-1's investment in drop-shippers was strategic. According to CS-1, the DME products, which are considered "off-the-shelf" braces, are manufactured overseas. The typical cost to ship such a brace is approximately $12 plus an additional $1 in shipping costs for each product, or, when using FedEx, $18 for a package that can hold more than one DME product. On average, CS-1 estimated, the profit for each product is about $20.

89.    The use of FedEx for DME shipments carried another important feature for the fraudulent scheme. FedEx can require signature for delivery. The patient signatures obtained through FedEx could, in turn, later be used by the DME fronts to support a claimed proof of delivery.

90.     Eventually, CS-1's company would deliver all of this information to "Brightree," a cloud-based clinical and business management software program. Brightree enables DME companies to process orders and claims electronically. CS-1 has leveraged the Brightree technology in the scheme. CS-1's employees routinely delivered patient and order information to Brightree. Once complete, the fraudulent DME companies could, in turn, purchase the information and then release the bogus order to Medicare for payment.

91.     CS-1 refers to the above-described panoply of services—*i.e.*, the chasing of leads, the development of leads, the coding and processing of claims via Brightree, *etc.*—as "Business Process Outsourcing" or "BPO."[11] CS-1 charges clients, meaning *de facto* owners of DME fronts, a hefty fee for "BPO" and related services.

### CS-1's DME Client Development and Fee Structure

92.     CS-1 provided information regarding a typical client development scenario. *De facto* owners of DME fronts were often introduced to CS-1's products and services through "lead testing," meaning CS-1 would offer samples of "leads" (*i.e.*, "doctors' orders"). The parties would also discuss the regular cost of CS-1's services. CS-1's fee—which the DME companies had to pre-pay—was $280 per doctor's order. According to emails and financial records, the prepayment of such costs appears to be an industry standard that other fraudulent "marketers" also

---

[11] "BPO" has seemingly been interchangeably referenced as not only "business process outsourcing," but also "back office processing." The distinction, if any, is not apparent, and could even be accidental. Notwithstanding, the precise underlying meaning of this acronym is not material to the fact that it describes a fraudulent transaction for a prepackaged complete doctor's order.

observe. CS-1 allocated these costs onto two separate invoices: one for "marketing" by "Chronos" for about 75% of the $280 fee, while Pantheon[12] would invoice the remainder as "BPO." Structuring the invoices this way, CS-1 admitted, was strategic. Sending separate invoices from different companies for ostensibly different services helped disguise the illegal transactions. A review of invoices from other fraudulent "marketers"—including Unique and others—revealed similar concealment strategies.

93.     CS-1 explained how he eventually arrived at the customary fee of $280 per "lead" (or "doctor's order"). According to CS-1, $280 was, for him, approximately the average cost to break even. When a patient received multiple DME products (and claims data show they often did), then CS-1 profited. Knowing this, CS-1 directed call center agents to "up-sell" braces.

94.     Importantly, CS-1 acknowledges that he has fraudulent "marketing" relationships with the Ever Prime conspirators as well as WILLIAMSKY/LEVIT. Financial records corroborate this: several of the Regency-established DME fronts that these conspirators own (and, in some cases, co-own) made substantial payments to CS-1's fraudulent "marketing" companies.

### Control of Multiple DME Fronts Key to Executing Scheme

95.     DME fronts, CS-1 explained, sometimes encounter issues, such as Medicare audits and recoupments. CS-1 apparently offered services to help struggling DME fronts tackle such problems. But, when issues were too

---

[12] Pantheon, it appears, may have provided some portion of services, including such as intake.

overwhelming, CS-1 acknowledged that owners often implemented "contingency plans." This meant, pertinently, shifting fraudulent claims from the struggling DME front to another front within the owner's control. As long as a struggling DME front was under heightened scrutiny, an alternative or newly formed DME company with a clean Medicare provider ID could serve as the conduit for the submission of fraudulent claims. CS-1 confirmed that such "contingency plans" are commonly implemented, including by the Ever Prime conspirators and others.

### WOLFE's Sale of "Turn-Key" DME Companies is Critical to the Scheme

96. The availability of multiple DME fronts to execute such "contingency plans" is necessary for the uninterrupted continuation of the fraud. But establishing a Medicare-eligible DME company, even if it is merely a front, takes time. The preparation and filing of corporate documents, Medicare enrollment forms, securing a lease, passing on-site inspections, and other steps create undesirable time and opportunity costs for the fraudulent DME enterprise. Consequently, as CS-1 observed, there is eager demand for turn-key, Medicare-eligible DME companies, primed to serve as conduits when a *de facto* owner's other fronts become less viable. REGENCY offers just such a turn-key product in this scheme.

97. During an interview with law-enforcement agents in April 2018,[13] WOLFE described REGENCY's services to include, critically, the creation and sale of "turn-key" DME companies. WOLFE acknowledged to agents that she had

---

[13] WOLFE was interviewed as part of an unrelated DME investigation, whose lead target was a now-convicted DME front operator from Savannah, Georgia.

created about 20 to 30 "turn-key" companies. Investigators have since tied WOLFE to many multiples more. WOLFE claimed to sell the DME companies as "stock purchases." These transactions, as discussed below, furthered the scheme by transferring Medicare billing privileges to new owners of the DME fronts.

98.     DME suppliers cannot, in the normal course, reassign their Medicare Identification Numbers. An exception, however, exists for "stock purchases" (*i.e.*, the sale of a DME company involving all of its assets and liabilities). With "stock purchases," a new owner can use the existing Medicare Identification Number, after providing Medicare with the purchase agreement and, pertinently, information about the new owners. By orchestrating the sales this way, WOLFE enables the new owners (i.e. the *de facto* owners, disguised via the straw or nominee owners) to begin immediately billing Medicare for fraudulent DME claims.

99.     WOLFE, the investigation revealed, has often used this stock-purchase strategy (among other tactics) to transfer numerous DME fronts to the control of other conspirators. Corporate and Medicare records commonly reflect these transitions of "ownership." As detailed throughout, the Regency conspirators typically established DME companies, reflecting themselves (or close associates) as the owners of record. Once the DME front clears all the necessary hurdles to bill Medicare, they amend these documents to reflect the names of the other conspirators, or a straw owner of their choosing, as detailed later.

**Emails and Financial Records Confirm Numerous
Ever Prime Transactions with WOLFE/REGENCY**

100.   Emails and financial records confirm numerous sales transactions between WOLFE and the Ever Prime conspirators for DME fronts in the Middle District of Florida and beyond.   For example, an email exchange between WOLFE and Ever Prime conspirators in May 2018 acknowledged, at that particular time, the creation of seven different DME-front locations.   In the emails, Adams directed Ever Prime CFO Ismail Kabook to "send Regency payment for $15k x 7 locations" for a total of "$105k."   Adams added, "Kelly please send an invoice."

101.   WOLFE, in turn, responds, "I just resent the invoices. Please note that they reflect a down payment amount of $30,000.00 but we agreed to accept the $15,000.00 now and the other $15,000.00 when you are able to (within 30 days)."   The requested "down payment" of $30,000, other emails confirmed, appears to be a fairly customary fee that WOLFE charges for the initial creation of the "turn-key" DME fronts.   WOLFE also typically collects a second installment—usually another $30,000—once the DME front is approved to bill Medicare, as set forth below:

| | Medicare Enrollment Date | Date of Payment to Wolfe/Regency | Amount |
|---|---|---|---|
| Advanced Medical Supply | 12/5/2017 | 1/11/2018 | $60,000.00 |
| American Bracing Solutions | 4/6/2018 | 4/10/2018 | $30,000.00 |
| Back Braces Plus | 2/24/2018 | 3/7/2018 | $30,000.00 |
| Bracing Partners | 3/30/2018 | 4/4/2018 | $32,018.00 |
| CP Bracing Supply | 4/24/2018 | 5/2/2018 | $30,000.00 |
| Jackson Medical Supply | 5/25/2018 | 6/12/2018 | $30,000.00 |
| Lucky Medical Supply | 4/27/2018 | 5/4/2018 | $30,000.00 |
| LJH Medical Solutions | 4/24/2018 | 5/4/2018 | $30,000.00 |

102.    The Ever Prime conspirators have made yet other payments, either directly or indirectly, to WOLFE and the Regency conspirators.  These substantial payments (including the ones noted above) total at least approximately $800,000 during the scheme.

## Defendants' Use of Nominee or Straw Owners

103.    *De facto* owners of the DME fronts, including PAT TRUGLIA, the Ever Prime Conspirators, and others, frequently used "straw owners" or "nominee owners" on legal and Medicare documents.  This included, critically, on Medicare enrollment applications, or "Forms CMS-855S."  The Form CMS-855S, as explained previously, seeks information about a DME company's managers and owners— meaning anyone who holds a 5% stake or more.  *De facto* owners of fraudulent DME companies, however, have strong incentives to lie about their controlling stakes, so they can distance themselves from the fraud, secret their existence from auditors, and secure multiple DME fronts without raising red flags.

104.    The ownership of multiple DME fronts is practically essential to survive within this fraudulent scheme.  First, as noted previously, the availability of multiple DME fronts is necessary to execute "contingency plans" when another front fails.  Straw owners are essential to the acquisition of multiple DME fronts because, as explained above, DME suppliers are typically prohibited from obtaining multiple NPIs.  Second, the fraud is best concealed by spreading the submission of false claims across several facially discrete entities.  Third, the use of straw owners means that *de facto* owners can sidestep certain mandatory disclosures, such as prior

Medicare payment suspension, revocation of Medicare billing privileges, or debarment. And many *de facto* owners—including some of the conspirators discussed herein—have reportable adverse actions.

105.   Concealing the true ownership of the DME fronts on the Form CMS-855S not only impedes the lawful functioning of a federal healthcare program, 18 U.S.C. § 371, it is also a crime in itself, 18 U.S.C. § 1001.

106.   The DME fronts established by REGENCY on behalf of the Ever Prime Conspirators are included in the below table, which also indicates the de facto owners, points of contact, and/or managers of each respective DME front:

|   | *De Facto* Owner/Manager/Point of Contact | DME Front |
|---|---|---|
| 1 | Burruss, Adams | Avondale HME |
| 2 | Burruss, Adams | Avondale HME 2 |
| 3 | Burruss, Adams | Avondale HME 3 |
| 4 | Burruss, Adams | Discovery Medical |
| 5 | Burruss, Adams | Essential Medical |
| 6 | Burruss, Adams | Essential Medical 2 |
| 7 | Burruss | PA Healthcare CA |
| 8 | Burruss | PA Healthcare PPO |
| 9 | Burruss | PA Healthcare 3 |
| 10 | Burruss, Adams, Bell Sr. | Universal Medical |
| 12 | Burruss, Adams | Universal Medsupport |
| 13 | Burruss, Adams | Heart Homecare |
| 14 | Burruss, Adams | Medical Rehab |
| 15 | Burruss, Adams | Advanced Medical |
| 16 | Burruss, Adams | SD Orthotics |
| 17 | Burruss, Adams | First Choice Medical |
| 18 | Burruss, Adams | Reliable Orthotics |
| 19 | Burruss, Adams | C&E Medical |
| 20 | Burruss, Adams | Back Brace Plus |
| 21 | Burruss, Adams | Bracing Partners |
| 22 | Burruss, Adams | American Bracing |
| 23 | Burruss, Adams | Caring For Your Pain Bracing |
| 24 | Burruss, Adams | Elite |
| 25 | Burruss, Adams | First Stop Medical |
| 26 | Burruss, Adams | LJH Medical Solutions |
| 27 | Burruss, Adams | Lucky Medical |

| 28 | Burruss, Adams | CP Bracing |
| 29 | Burruss, Adams | Crown Medical |
| 30 | Adams/Williamsky | Jackson[14] |
| 31 | Burruss, Adams | United Health-Wear |
| 32 | Burruss, Adams | Layne Medical |
| 33 | Burruss, Adams | West Side Bracing |
| 34 | Burruss, Adams | Tree Top Medical |

107.    The above list is corroborated by other information gathered through the investigation, including an insider document entitled the "Ever Prime Address Book," discussed further below.  Financial records also corroborate the Ever Prime Conspirators' use of straw owners.  The Ever Prime conspirators often funded the straw owners' "purchase" of the DME fronts.  They did so by funneling money to straw owners at or around the inception of a new DME front.  The straw owners, in turn, used some or all of this money to fund bank accounts associated with the DME company, which, at least according to public record, the straw owner putatively owned.

108.    These layered transactions created the appearance that the straw owners owned the DME fronts, but this is not so.  The Ever Prime conspirators actually owned, controlled, and/or managed their affiliated DME fronts.  This is evident from, among other evidence, the conspirators' status as signors on the DME fronts' bank accounts, email communications, and, critically, the disposition of the

---

[14] Two separate and distinct DME companies operate under the name "Jackson Medical Supply." One company (NPI #1689980948) is located in Pearl, Mississippi, and is purportedly linked to WILLIAMSKY.  The other (NPI #1659879625) is located in Largo, Florida, and linked to Ever Prime, which includes Adams.

DME fronts' proceeds, which were used to buy luxury items and to throw a lavish party honoring Burruss on his 50th birthday.

109.   Ever Prime's internal financial documents also reveal the Ever Prime conspirators' ownership interests in the Regency-established DME fronts, as well as a financial relationship with WILLIAMSKY.  An internal Ever Prime document entitled "DME Distribution 2018-2019" reflects periodic accounting for various DME fronts within Ever Prime's control, including those established by REGENCY. An excerpt, isolating key columns for the reflected period, is set forth below as displayed in Excel:

| A | B | C | D | I | J | K | L | M | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Owner | | Company Name | Gross | $$ After Loans | Mang Fees | Owners Draw O.D. | Manag Invoice Amount | D2D @ 33% After O.D. | Mang fees after D2D and O.D. | Atlantic @ 5% after D2D & O.D. | EP Keep | Payments Total |
| Anthony Tucker | 1 | Absolute Comfort Medical, Inc | - | - | - | - | - | - | - | - | - | - |
| Dave Adams | 2 | Advanced Medical Supply | 225,000 | 225,000 | 225,000 | 45,000 | 180,000 | 60,000 | 120,000 | 6,000 | 114,000 | 225,000 |
| Nick | 3 | Avondale 1 | 1,200,000 | 1,200,000 | 1,200,000 | 120,000 | 1,080,000 | | 1,080,000 | 54,000 | 1,026,000 | 1,200,000 |
| Nick | 4 | Avondale 2 | - | - | - | - | - | | - | - | - | - |
| Nick | 5 | Avondale 3 | - | - | - | - | - | | - | - | - | - |
| Thomas | 6 | American Bracing Solutions, Inc | 400,000 | 400,000 | 400,000 | 40,000 | 360,000 | 120,000 | 240,000 | 12,000 | 228,000 | 400,000 |
| Danny | 7 | Back Braces Plus, In | 200,000 | 50,000 | 50,000 | 5,000 | 45,000 | 15,000 | 30,000 | 1,500 | 178,500 | 200,000 |
| Vincent Brown | 8 | Belle Oak Bracing, Inc | - | - | - | - | - | | - | - | - | - |
| JAMONT JONES | 9 | Bracing Partners, Inc | 700,000 | 600,000 | 600,000 | 120,000 | 480,000 | 160,000 | 320,000 | 16,000 | 404,000 | 700,000 |
| CINDY PHAN | 10 | CP Bracing Supply | 600,000 | 600,000 | 600,000 | 60,000 | 540,000 | | 540,000 | 27,000 | 513,000 | 600,000 |
| Devin Heppler | 11 | C&E Medical | 350,000 | 350,000 | 350,000 | 35,000 | 315,000 | 105,000 | 210,000 | 10,500 | 199,500 | 350,000 |
| DUSHAUN FAIRLEY | 12 | Caring for Your Pain, Inc | 450,000 | 450,000 | 450,000 | 45,000 | 405,000 | 135,000 | 270,000 | 13,500 | 256,500 | 450,000 |
| Michelle King | 13 | Crown Medical | 900,000 | 900,000 | 900,000 | 135,000 | 720,000 | | 720,000 | 36,000 | 684,000 | 900,000 |
| Andrew Roberts | 14 | Discovery | 250,000 | 250,000 | 250,000 | 25,000 | 225,000 | 75,000 | 150,000 | 7,500 | 142,500 | 250,000 |
| Sheila Nejat | 15 | Elite | 800,000 | 800,000 | 800,000 | 80,000 | 720,000 | | 720,000 | 36,000 | 684,000 | 800,000 |
| Monica Adams | 16 | Essential 1 | 300,000 | 300,000 | 300,000 | 30,000 | 270,000 | 90,000 | 180,000 | 9,000 | 171,000 | 300,000 |
| Monica Adams | 17 | Essential 2 | 200,000 | 200,000 | 200,000 | 20,000 | 180,000 | 60,000 | 120,000 | 6,000 | 114,000 | 200,000 |
| Elahe Nejat | 18 | First Choice | 700,000 | 700,000 | 700,000 | 70,000 | 630,000 | | 630,000 | 31,500 | 598,500 | 700,000 |
| DEAN MERRICK | 19 | First Stop | 1,000,000 | 1,000,000 | 1,000,000 | 100,000 | 900,000 | | 900,000 | 45,000 | 855,000 | 1,000,000 |
| Jarom Warren | 20 | Heart Homecare | 350,000 | 350,000 | 350,000 | 35,000 | 315,000 | | 315,000 | 15,750 | 299,250 | 350,000 |

‹ … | Distrubutuion 11-1-18 | Distrubutuion 11-9-18 | Distrubutuion 11-16-18 | Distrubutuion 11-30-18 | Distrubutuion 12-28-18 | Distrubutuion 1-9-19 | Sheet … ⊕ ›

110.   Column A reflects the names of the various straw owners placed side-by-side with the DME front that each putatively owns.  Column K, entitled "Owners Draw" or "O.D." reflects the amounts paid to these straw owners.  This amount is typically between 10% and 20% of "Gross" (i.e., Column D).

111.   WILLIAMSKY/LEVIT's share of the fraud proceeds is reflected in Column M, which denotes "D2D @ 33% After O.D." "D2D" appears to mean "D2D Power Sales," which is WILLIAMSKY's company. Thus, for certain DME fronts (emphasized in the original using red font), WILLIAMSKY's company D2D Power Sales receives 33% of "Gross" (Column D) after subtracting the "Owner's Draw" (Column K) and other "fees" (such as loans, Column I).

112.   Ever Prime's revenue-sharing agreement with WILLIAMSKY appears to apply to at least the following DME fronts: Advanced Medical Supply, American Bracing Solutions, Back Braces Plus, Bracing Partners, Caring for Your Pain, Discovery, and Jackson Medical.

113.   Notably the heading for Column R denotes "EP Keep," likely meaning Ever Prime's "keep" of the fraud proceeds. For the DME fronts, "EP Keep" (Column R) ranges from 51% to 88% of gross receivables (Column D).

**WILLIAMSKY/LEVIT also operate their own fraudulent DME Network**

114.   WILLIAMSKY AND LEVIT also operate their own network of DME fronts, some of which were established by WOLFE and the Regency conspirators, including:

| DME Front Name | Medicare ID | Reported Address |
| --- | --- | --- |
| Ace Medical Supply, Inc. | 7667410001 | 14004 Roosevelt Blvd., Suite 610 Clearwater, FL 33762 |
| MKS Medical Supply, Inc. | 7666930001 | 801 W Bay Drive, Suite 307 Largo, FL 33770 |
| Franz Medical Supply | 7708790001 | 4707 140th Ave., N., Suite 307 Clearwater, FL 33762 |

115.    For the above-referenced DME fronts, corporate filings, business

records, and/or Medicare documents reveal transitions of ownership from

REGENCY to WILLIAMSKY/LEVIT.  Also, for concealment, the conspirators

often structured the deals using nominee owners.  For example, the Regency

conspirators established MKS Medical Supply, Inc. ("MKS") in POPPE's mother's

name, "Michelle Lapalme."  MKS, once eligible to bill Medicare, was "sold" to

nominee owner "Magda Soto," an associate of WILLIAMSKY/LEVIT.

Contemporaneous to this "sale," WILLIAMSKY's company, D2D Power Sales,

wired $90,000 to Lapalme's personal bank account, which Lapalme largely withdrew

in cash.

116.    Though REGENCY established at least three of

WILLIAMSKY/LEVIT network DME fronts, emails reveal that the

WILLIAMSKY/LEVIT network is vastly broader.  For example, in a December

2017 email to WILLIAMSKY, WOLFE described a prior business-development

conversation they had.  She pertinently wrote:  "Based on our conversation you said

**you have 40 stores, billing 500 devices per week each, 2 devices per patient**.  This

would result in approximately 250 patients loaded per store for a total of 10,000

patients per month total." (Emphasis added).

117.    The business-development conversation between WOLFE and

WILLIAMSKY alludes to common features of these fraudulent DME schemes,

including: controlling multiple DME fronts, the implicit reliance on nominee

owners, using the multiple fronts to distribute patients and claims, and driving up

revenue by billing for multiple braces per patient, without regard for medical necessity.

### Ever Prime and WILLIAMSKY's Fraudulent Relationship
### with the Friedmans/SKF Enterprises LLC

118.    The Ever Prime conspirators and WILLIAMSKY also have fraudulent ties to the Friedmans, a married couple who run SKF, a fraudulent "marketing" company. SKF is located in Holiday, Florida.

119.    Samuel and Krystal Friedman own and operate SKF, which, during the scheme, sold fraudulent "doctors' orders" to WILLIAMSKY, the Ever Prime conspirators, and others. The Friedmans also briefly operated a joint venture— another fraudulent "marketing" company—with the Ever Prime conspirators and WILLIAMSKY. The conspirators named their fraudulent joint venture Kaska Enterprises, Inc. ("Kaska"), according to Florida corporate filings. The conspirators formed Kaska, emails showed, to bring the creation of fraudulent "doctor's orders" in-house. The vertical integration would, the conspirators hoped, cut costs.

120.    Florida corporate records disclosed the following individuals and entities as Kaska's officers/directors: "Armahni Inc.," "Burruss Enterprises Inc.," Samuel and Krystal Friedman, and Aaron Williamsky. Though it is self-evident that "Armahni Inc." and "Burruss Enterprises Inc." respectively refer to ADAMS and BURRUSS, emails regarding Kaska's formation and operations confirm both of their involvement.

121.   For example, the conspirators discussed details regarding how Kaska would approach beneficiaries during telemarketing calls for braces. Adams, copying Burruss, provided his thoughts on "branding" and customer contact:

a.   Samuel Friedman wrote his partners: "Who do the phone reps say they are with? We can't use Kaska; patients aren't going to relate to that." He added: "We need to either license a DBA that has a medical sound that we can use for Marketing; or we need to use one of the DME'S for branding."

b.   Adams, in turn, offered the suggestion that Kaska use "a broad medical name for all original incoming calls with agents letting them know at the end if they're approved for the brace they'll be contacted by one of our partner DME companies."

122.   Samuel Friedman, in response, volunteered a solution borrowed from his other fraudulent "marketing" company, SKF. Friedman responded to Burruss, Adams, and WILLIAMSKY: "We have a licensed Dba for marketing called the Doctor patient advocacy network; which is what the skf ent phone reps use." By "skf ent," Friedman likely meant SKF Enterprises LLC.

123.   As the conspirators formed Kaska, Friedman frequently drew upon SKF's operations and practices. He even circulated a call script that SKF agents used to cajole beneficiaries during DME calls. The script revealed, among other compliance issues, a conscious disregard of medical necessity and, further, that beneficiaries were excused from copayments long before they even received their DME products. Excerpts from SKF's call-center script are set forth below.

## 2.   I don't want to do this right now / over the phone / I don't understand.

a. Don't worry! No decision is being made over the phone today, we will never ask you for payment information, this is just a consultation to see if you qualify for medical grade brace that you may be eligible to receive at little to no cost to you.

## 4.   My Doctor wouldn't approve this! / My Doctor wouldn't let me get a brace!

a. That's ok! We actually are partnered with a network of licensed medical professionals that work in hospitals, as well as private practices across the United States, that upon reviewing the consultation that we perform today, may sign the necessary prescription to let us send you a pain relieving product, without the hassle of making a doctor's appointment or paying a co-pay! The doctor reviewing your request will be from the state you live in, and will give speak with you over the phone briefly after our consultation. There is nothing wrong with getting a second opinion, so let's see if we can help! You said you had ____ pain, right? (continue call where you left off)

124.   By December 2017, emails showed, Kaska was a humming operation, generating numerous fraudulent doctors' orders. Samuel Friedman wrote his partners: "We are at just under 100 orders for the week on Kaska (braces). There are still 417 Rx's pending from Telemed; we usually have our highest day on Thursday night, and Friday AM from Telemed." Kaska delivered some of its doctors' orders to DME fronts that WILLIAMSKY and/or the Ever Prime conspirators controlled.

125.   Ultimately, the joint venture, emails suggested, appeared to benefit Ever Prime and WILLIAMSKY more than the Friedmans. Samuel Friedman expressed to the others that Kaska was, in essence, "draining" SKF's resources. Accordingly, the conspirators agreed to close Kaska, a decision that Friedman strongly advocated. And to stave off any bitter feelings, Friedman offered his former

44

partners the following: "If nothing else, I hope that your DME'S were able to prosper somewhat from Kaska's brief existence, in getting marketing at a reduced rate. In order to help cushion the blow of this drastic change, SKF will offer an additional $10 reduction on marketing fees, per item[.]"

126. Though Kaska ended, SKF continued—and continued selling fraudulent doctors' orders to Ever Prime and WILLIAMSKY. Financial records for SKF, for the period of January 1, 2017 to January 31, 2019, showed over $2.6 million in payments from known DME fronts and related entities associated with Ever Prime or WILLIAMSKY/LEVIT.

127. The above supports that the Ever Prime conspirators, WILLIAMSKY, the Friedmans, and SKF violated a host of federal criminal laws, including 18 U.S.C. §§ 371, 1347, 1349, and others.

**Information from a former Regency-established DME front employee (CS-2)**

128. A former employee, referred to herein as "CS-2," of REGENCY worked for Advanced Medical Supply ("Advanced")—an Ever Prime DME front— as a "customer service representative" from approximately March 2018 through on or about July 8, 2018, when she was fired by WOLFE. She has provided the following information:

129. Advanced was located at 1301 Seminole Boulevard, Suite 142, in Largo, Florida, in the same building as REGENCY. The CS-2's job duties included answering phones (including for patient complaints), handling mail and checks, responding to audits, and forwarding mail to "managers" in California.

130.   The CS-2 was hired by WOLFE at the same time as six other new employees. Each of the new hires was assigned to different, but affiliated, DME companies; many were even located in nearby suites at the same office complex. The new hires were all given the same job title and duties.

131.   WOLFE organized the new employees' orientation and training. During the first month or so, and prior to the date of training, the CS-2 was bored, having little to do at Advanced.

132.   Then training was conducted. The three trainers (Kristina Wexler, Jimmy Darling, and Daniil Demidov) flew in from California, which they referred to as "home base." California is where Ever Prime is headquartered. All managerial and billing issues, the trainers explained, would be addressed by "home base."

133.   During training, Wexler noticed that the CS-2 was not set up with a MacBook. Wexler contacted WOLFE, who, in turn, purchased a new MacBook for the CS-2. "Wolfe's people" then set up the new computer for the CS-2. The computers used during training were from WOLFE's company, REGENCY.

134.   During training, the trainers mentioned that the braces cost only approximately $50; however, the CS-2 understood that the company could get reimbursed almost $1,000 from Medicare. Demidov told the new hires, including the CS-2, that the "leads" came from the Philippines, where they sold the braces to beneficiaries over the phone. Demidov told the new employees that they buy these "leads"; however, they should never tell anyone that they buy them.

135.     Each DME company had its own office suite.  All of the DME companies were "one-person offices," particularly since business/drop-shipping was conducted via FedEx.

136.     Though the new employees were technically assigned to different DME companies, all knew and understood that they were working for the same organization in California.  That said, the CS-2 explained that each company had an "investor."  The investor for Advanced was supposedly "David."  The CS-2 learned of "David" during her training, when all the customer service representatives were advised of which "investor" their respective companies had.

137.     During the training, another person's identity was revealed. Apparently, the California trainers referred to "Charles Burruss" as "the big guy," or the owner, of all the DME companies.  The CS-2 never met BURRUSS, but understood that he "set all the rules."  This further supports that BURRUSS, at a minimum, was the *de facto* owner/manager of Advanced as well as several other known DME fronts in the Middle District of Florida.

138.     Initially, the CS-2 reported to Stan Young, who was in California. After Young, Demidov (also in California) assumed that role.  Eventually, Demidov was replaced by Megan Marcotti, who was, again, based in California.

139.     The CS-2 received calls "all the time" from beneficiaries complaining they did not want, order, or need the braces that were sent by Advanced.  Many beneficiaries stated that their physician never prescribed the braces.

140. The CS-2 was instructed by the Ever Prime trainers to tell beneficiaries that they could not accept returns of their braces. Beneficiaries regularly advised her that they would report Advanced for committing Medicare fraud.

141. The CS-2 also received calls from beneficiaries complaining about their DME invoices because the beneficiaries had been told that their braces would be free. The CS-2 was trained to tell any beneficiary complaining about an invoice that the costs would be waived.

142. The CS-2 was expected to report to Marcotti (who was at "home base" in California) which beneficiaries had complained. Marcotti would then routinely zero out any balance that the beneficiary owed.

143. All braces shipped to beneficiaries required a signature upon delivery. These signatures were submitted during insurance audits as proof of delivery, including to Medicare.

144. FedEx typically attempted delivery of the DME to a beneficiary on three separate occasions, or until the beneficiary either accepted or rejected the package. When a package was not accepted or delivered, the return came to Advanced. The CS-2 would sign for each of these undeliverable boxes.

145. The CS-2 received between five to six undeliverable boxes of braces per business day. It was not uncommon to have fifty boxes of returned packages at any given time in the office. Part of her job was to sort out the returned supplies to ship back to "the warehouse."

146. The CS-2 was also tasked with responding to insurance audits. For each audit request, she put together a package containing the bogus prescription, delivery confirmation/signature of receipt from FedEx, and other pertinent information showing, ostensibly, that the claim for reimbursement was valid.

147. When the CS-2 first started working for Advanced, she would receive one audit request from Medicare per week. Toward the end of her employment in July 2018, Advanced was receiving between five and six audit requests per day from Medicare. When the CS-2 was putting together audit response packages, she noticed some of the signature receipts (which were supposed to indicate the beneficiary's signature upon receiving the DME) in Advanced's electronic files were the CS-2's very own signature, from return deliveries to the Advanced office suite.

148. The CS-2 also noticed many of the Medicare payment checks that she reconciled for the audit were for beneficiaries who had refused delivery of the DME.

149. The CS-2 then began to suspect that the returned items were being billed to Medicare even though they were never delivered. She notified Marcotti and WOLFE on several occasions regarding this issue.

150. The CS-2 was also, without her knowledge, listed as the Registered Agent for Advanced with the State of Florida. A Sunbiz[15] filing for Advanced dated May 3, 2018, of an Amendment to the Articles of Incorporation, includes the CS-2's authentic signature as Advanced's Registered Agent. The CS-2 recalled receiving this signature page via email from Marcotti, who advised her that her signature was

---

[15] Meaning the State of Florida, Division of Corporations.

required as Advanced's on-site representative.  The CS-2 did not understand that the signature on this form established her as the Registered Agent for Advanced.

151.   The CS-2 is still currently listed as Advanced's Registered Agent, even though she was fired in July 2018.

152.   The Sunbiz packet for Advanced also reflects "David Adams" as Advanced's Manager.  As noted previously, the Ever Prime trainers advised the CS-2 that the "investor" in her company was named "David."

153.   "David," it bears noting, likely refers to "David Adams," who is falsely listed as Advanced's "manager" and "sole owner" according to the company's false Medicare enrollment submissions.  In truth, the Ever Prime conspirators own and control Advanced.

154.   David Adams appears to be "David Vernon Adams," a 61-year-old man living in Redmond, Oregon.

155.   David Adams, a 61-year-old man living in Redmond, Oregon, has been linked to Ever Prime conspirator Armani Adams, whose given name is "Ardalaan Adams."  Specifically, in 2008, Ardalaan Adams was convicted in the Western District of Michigan (Case no. 1:07-cr-00221-GJQ) for a drug-trafficking conspiracy involving cocaine and MDMA.  Sentencing documents in that case identify "David Adams" as Adams's father.[16]

---

[16] Additionally, David Adams filed for bankruptcy in March 2016.  The filings reflected that David Adams was purportedly unemployed, with between $100,000 and $500,000 in debts/liabilities.  It is unlikely that, by 2017, this financially distressed individual would have the resources to purchase a DME company 3,000 miles away in Florida.

156.    This and other evidence supports that David Adams is Advanced's "straw owner," corroborating that the Ever Prime and Regency conspirators submitted false statements to Medicare regarding the true ownership of this DME front.

157.    During the course of her employment at Advanced, the CS-2 received a document entitled "Ever Prime Address Book", which was in Excel format and included detailed information about the organizational structure for the Ever Prime Network that controlled the numerous DME affiliates in Florida, including Advanced.[17]

158.    The CS-2 often relied on the Ever Prime Address Book to look up contact information (*e.g*, phone numbers, emails) for people within the Ever Prime Network, as well as external "marketers."

159.    The Ever Prime Address Book has several tabs, including, importantly, an "Active Marketers" directory, which, as the CS-2 understood, referred to "lead sources." This directory named several known fraudulent marketers in this scheme, including Chronos, Cure, Unique, and several others (*i.e.*, ProProfit, Empire, Gateway, Logan Mktg, Louis/MLL Marketing, M Marketing, Nationwide Partners, ProfitReps, Paddle Point, Prizm Media, REMN Mgmt, RajLance, and US Cares).

160.    The Ever Prime Address Book contains other sections, including: (i) the "Distributions List," which lists many of Ever Prime's DME fronts and

---

[17] The CS-2 estimated that she had first received the document in or around May 2018 during her employment at Advanced.

associating them with Burruss and/or Adams, and (ii) "DME Assignments," which appears to list operational points of contact (*e.g.*, billers, customer service reps) for each DME front.

161.    While CS-2's information regarding Advanced is provided as an example, the government's investigation, including analysis of claims data, financial data, beneficiary complaints, internal corporate documents, consensually monitored communications, and witness interviews, indicates that all of the Regency-established DME fronts referenced herein operate in similar fashion to Advanced, and are engaged in the same false and fraudulent conduct, including submitting, or causing the submission of, false and/or fraudulent DME claims to Medicare.

162.    The CS-2's information further supports that the Ever Prime conspirators, in concert with the Regency conspirators, have violated a host of federal laws, including by submitting or causing the submission of false and fraudulent claims to the Medicare program, as well as lying to Medicare regarding the true owners and managers of the DME fronts.

<u>**Fraudulent "marketers" Cure and Unique also**</u>
<u>**illegally sell "doctors' orders" to many Regency-established DME fronts**</u>

163.    Cure and Unique are listed as "Active Marketers" in the Ever Prime Address Book. These fraudulent "marketers" supply "leads" or fraudulent "doctors' orders" to many of the Regency-established DME fronts within the Ever Prime Network. This is supported by emails, witness interviews, and financial analysis, as detailed next.

164. With regard to Cure: In an April 2018 email exchange with a Chronos representative (though not CS-1), Adams confirmed that Cure was a "new lead source"—meaning a new source for "doctors' orders"—for the Ever Prime DME fronts. This is consistent not only with the Ever Prime Address Book, but also financial records.

165. Cure's financial records show substantial payments to so-called "lead generators." For example, Cure paid CRH Holdings—a Florida corporation doing business as "Lead Bridge"—and its principals over $500,000. A principal of Lead Bridge holds himself out as a "DME Campaign Manager."

166. Cure's bank accounts also reveal extensive financial ties with Ever Prime. Practically all deposits to Cure's bank account came from known Ever Prime DME fronts. Between February 2018 and December 2018, deposits from the Ever Prime DME fronts (as set forth below) totaled $4,345,694; this represents over 97% of total deposit items (excluding incoming wires) for the period. The Ever Prime DME fronts in the Middle District of Florida are denoted with asterisks:

| Ever Prime DME Front | Total Payments to CURE |
|---|---|
| American Bracing Solutions, Inc.* | $25,000 |
| Back Braces Plus, Inc.* | $25,000 |
| Caring For Your Pain Bracing* | $25,000 |
| Discovery Medical Supply* | $508,626 |
| Jackson Medical Supply* | $25,000 |
| Layne Medical Supply* | $397,840 |
| LJH Medical Solutions* | $284,100 |
| Lucky Medical Supply, Inc.* | $25,000 |
| Westside Medical Bracing, Inc.* | $687,600 |
| Avondale HME, Inc. | $15,000 |
| C&E Medical Inc. | $25,000 |
| Essential Medical Supplies, LLC | $204,100 |

| | |
|---|---|
| Medical Rehab Supply, Inc. | $975,553 |
| Reliable Orthotics | $30,000 |
| SD Orthotics | $50,000 |
| United Health Wear, LLC | $1,042,875 |
| **TOTAL:** | **$4,345,694** |

167.   With regard to Unique: Emails between Unique and the Ever Prime conspirators referenced the sale of prescriptions to Ever Prime's DME fronts. For example, in a January 2019 email, Unique's owner, Steven Parker, pertinently wrote Adams: "Here are Scripts for 51 Braces for American Bracing. Share this file with those who should have access. We appreciate your business. Thanks, Steve." "American Bracing" likely means "American Bracing Solutions," a Regency-established Ever Prime DME front located in the same building as REGENCY in Largo, Florida.

168.   The CS-2, discussed above, specifically recalled that Unique was a "lead" source, including because of disproportionate patient complaints arising from Unique's "leads" (meaning fraudulent doctors' orders).

169.   Unique's financial records, like Cure, also reveal extensive financial relationships with Ever Prime. The Ever Prime DME fronts, for the period examined, account for over $24 million in deposits to Unique's bank account, as set forth below. Approximately 22%, or $5.7 million, came specifically from Ever Prime DME fronts in Florida (denoted by an asterisk), which REGENCY created.

| Ever Prime DME Front | Total Payments to Unique |
|---|---|
| Avondale HME | $4,811,950 |
| Advanced Medical Supply, LLC* | $1,110,000 |
| American Bracing Solutions, Inc.* | $725,000 |
| Back Braces Plus, Inc.* | $125,000 |

| | |
|---|---|
| Bracing Partners, Inc.* | $400,000 |
| Caring For Your Pain Bracing* | $600,000 |
| CP Bracing Supply* | $805,000 |
| Discovery Medical Supply* | $1,254,835 |
| First Stop Medical Supply, Inc.* | $375,000 |
| Westside Medical Bracing, Inc.* | $50,000 |
| Universal Medical Solutions | $100,000 |
| Crown Medical Solutions, LLC | $400,000 |
| First Choice Medical Supply, Inc. | $1,030,000 |
| Heart Home Care LLC | $1,159,686 |
| C&E Medical Inc. | $980,000 |
| Essential Medical Supplies, LLC | $5,276,870 |
| Medical Rehab Supply, Inc. | $1,459,975 |
| Reliable Orthotics | $1,025,000 |
| SD Orthotics | $845,000 |
| TOTAL: | $24,741,666 |

## Information from a current REGENCY employee (CS-3)

170.    One of REGENCY's current employees (the "CS-3") has also
provided information about the Defendants' fraudulent DME schemes.  REGENCY
hired the CS-3 in April 2018.  But the CS-3 has never worked in Largo, Florida,
where REGENCY maintains its principal place of business.  Rather, the CS-3 works
in Chattanooga, Tennessee, where WOLFE and the Regency conspirators have
expanded, both geographically and operationally.

171.    Though initially hired as an administrative assistant, the CS-3
currently helps REGENCY manage approximately ten DME fronts in the
Chattanooga-area.  Some of these DME fronts, including STAR, belong to known
conspirators, as set forth below:

| DME Front | Address | Owner/Manager |
|---|---|---|
| STAR MEDICAL SUPPLY | 6802 Ringgold Rd, Suite 105, East Ridge, TN 37412 | Ever Prime |
| Sunshine Medical Solutions | 6148 Lee Hwy, Suite 203, Chattanooga, TN 37421 | Ever Prime |
| Cherry Medical Supply | 6148 Lee Hwy., Suite 116, Chattanooga, TN 37421 | R&L Conspirators |

55

### The CS-3's Understanding of REGENCY's
### Operations and Organizational Structure

172.   The CS-3 has provided the following information regarding

REGENCY's current operations and organizational structure:

173.   WOLFE remains at the helm of REGENCY, which continues to open

DME fronts, including in Tennessee.  The DME fronts purportedly sell braces.  But

prior to doing any business or dealing with any real customers, REGENCY sells the

DME fronts to new owners or investors as soon as they become eligible to bill

Medicare.

174.   The CS-3 identified REGENCY's other key personnel or officers.  She

mainly contacts these individuals on their cell phones, including voice and text.

Some have also physically visited the operations in Tennessee, including

KOEHLINGER and POPPE.  Notably, during a recent visit to Chattanooga-area

operations in February 2019, KOEHLINGER even oversaw the installation of

surveillance cameras that the CS-3 believes send live audio- and video-feeds to

REGENCY or others.

175.   KOEHLINGER is the second-in-command at REGENCY; she is

integral to WOLFE's operations.  The CS-3 noted that WOLFE and

KOEHLINGER are often together and share a personal assistant named "M.T."

176.   During her tenure at REGENCY, the CS-3 has also interacted with

POPPE on numerous occasions.  Notably, POPPE had routinely directed the CS-3

to place fictitious documents—including fake patient files and fake drop-shipping contracts—at the various DME fronts, including for inspection purposes.

177.   The CS-3 also worked frequently with FRANZ "LJ" HILBERATH, WOLFE's 24-year-old nephew. HILBERATH is considered a "manager" at REGENCY. CS-3 has explained that HILBERATH works from his home. CS-3 communicates with him regularly via his cell phone (voice and text) and email concerning the illegal conduct described next. Among other duties, HILBERATH runs the so-called "entitlement checks" for DME claims for prospective patients. As detailed further below, the R&L conspirators were the main customer for this new service offered by REGENCY.

### The Regency Conspirators Directed the CS-3 to Make Local Arrangements for DME Fronts in Tennessee

178.   REGENCY's principal place of business is located in Largo, Florida. As such, WOLFE and KOEHLINGER directed the CS-3 to handle on-the-ground tasks necessary to expand REGENCY's DME fronts into Tennessee. While the CS-3 was handling local needs in Tennessee, she understood that the Regency conspirators were busy in Florida with other tasks to start up the new DME companies, such as, obtaining NPI numbers and establishing bank accounts.

179.   The CS-3's local tasks mainly included locating new office space, hiring employees to staff (or to "sit in") each office location, and, later, assisting with "preparations" for on-site inspections. For these tasks, the Regency conspirators gave the CS-3 some telling instructions, as detailed next.

180.   For office space, WOLFE directed the CS-3 to site no more than three DME offices or suites at any given office complex. This is likely a measure to avoid drawing too much unwanted attention—particularly from inspectors—due to multiple co-located DME fronts in the same building.

181.   For hiring, the CS-3 was told to hire one "administrative assistant" per each new DME location. WOLFE and KOEHLINGER advertised the positions, while the CS-3 interviewed the candidates in Tennessee. The administrative assistant, once hired, would sit at an assigned DME location; nonetheless, all were considered REGENCY employees (at least prior to Medicare approval). KOEHLINGER told the CS-3 that, though the assistants were REGENCY employees, there should be no "Regency stuff" in their personnel files.[18] This creates the appearance that the assistants were actually employed by the DME fronts, rather than REGENCY.

182.   The administrative assistants are expected to sit, waiting, in their assigned DME store during posted business hours every day. KOEHLINGER emphasized to the CS-3 that a DME store without a body is "at risk"—meaning at risk of a surprise inspection by Medicare.

183.   Even after receiving Medicare approval, a DME front still needs "a body" in case of a re-inspection. Thus, the CS-3 confirmed, the Regency

---

[18] Once approved to bill Medicare, REGENCY would transfer the assistant, along with the DME front, to the new owner as part of a purported "turn-key" sale. With this, the new owner would pay the employee. But, should the owner not want to keep the employee, she could be transferred to the next DME store that REGENCY opened. Still, even after a "sale," REGENCY provides floating staff to cover the DME fronts to avoid any hiccups with potential surprise Medicare inspections.

conspirators remained involved in mitigating risks to the DME fronts, even after they were sold to "nominee owners"/ other conspirators. REGENCY took steps to ensure, among other things, that the DME fronts were staffed with a "body" during "posted hours of business," a required standard for DME suppliers in the Medicare program. *See* 42 C.F.R. § 424.57(c).

184. The conspirators' emails corroborate this information. WOLFE actively mitigated concerns regarding inspections and re-inspections at various DME sites for her clients. For example, in a May 2018 email to the Ever Prime conspirators, WOLFE asked Adams a series of questions about an apparent re-inspection of one of the DME fronts, pertinently stating: "Could you let me know who the inspector was? Did they come into the store or just request by mail? ... Just want to make sure I have the full picture when I present to the person that might be able to look into it and let me know what triggered this and/or if it's a trend."

### Fake Documents Planted at DME Fronts for On-Site Inspections

185. The Regency conspirators also directed the CS-3 to assist with key on-site inspections of DME fronts. This involved planting critical documents at the DME sites, such as important supplier contracts that Medicare requires to secure billing privileges. *See* 42 C.F.R. § 424.57(c) (requiring DME suppliers to contract with a company for the purchase of items necessary to fill orders). It also included patient files for supposed customers who had purportedly visited the stores. But the records were all fakes. POPPE and KOEHLINGER routinely sent the CS-3 fake

supplier contracts and fake patient files to place on-site at every DME front in anticipation of the Medicare inspection. The fake documents are described below.

### Fake Supplier Contracts with "Magic Medical, Inc."

186.  As noted previously, to secure billing privileges for Medicare, DME companies must either fill their orders using their own inventory, or contract with other companies—meaning drop-shippers—for the purchase of items necessary to fill the order. *See* 42 C.F.R. § 424.57(c).

187.  REGENCY's DME fronts do not maintain their own, in-house inventory of DME supplies, as multiple witnesses have confirmed. Consequently, to appease and to trick Medicare inspectors, the Regency conspirators drafted fake contracts between the DME fronts and a purported orthotics supplier named "Magic Medical." "Magic Medical" is a shell company that WOLFE formed to create and maintain fraudulent documents in furtherance of the scheme.

188.  The DME fronts established by the Regency conspirators, according to financial analysis, have not made a single payment to "Magic Medical." Further, according to Florida corporate records, "Magic Medical" did not even exist until March 6, 2018. By then, however, "Magic Medical" had already entered contracts with other known DME fronts established by REGENCY. An example of such a contract is below:

**MAGIC MEDICAL, INC.**
**ACCOUNT CONTRACT FOR INVENTORY**

This agreement outlines the primary terms and conditions between INDIAN SHORES
BRACING, INC. and MAGIC MEDICAL, INC.

**Effective Date:** This Agreement shall commence on 2/01/18. This agreement will auto-renew
annually unless there is prior notice of cancellation.

Items Provided:   Off the shelf Orthotics

□ **Payment:** Payment terms will be net 60 days after the invoice and the order have generated
and shipped.

□ **Credit:** An initial credit limit of $10,000 will be provided by Magic Medical. Any decisions
with respect to the extension, continuation or termination of your credit availability will be at
the sole discretion of Magic Medical.

□ **Orders:** All orders can be placed via Phone, Fax, Email.  Orders will be acknowledged within
24 of receipt via email. Buyer will be notified in the event that there are any issues or
backorders related to each individual order.

□ **Return Policy and Warranty Statement:** MAGIC MEDICAL, INC. offers a 6 month return
policy.

□ **CMS Requirements:** If you choose to be reimbursed by Medicare, please make sure to
understand and abide by the DMEPOS Supplier Standards, which are listed entirely in
42.C.F.R pt. 424.57©.

□ **Concerns and Complaints:** For any questions, concerns and/or complaints, please don't
hesitate to reach out to our Customer Support Team directly.

**INDIAN SHORES BRACING, INC.**

Account # 321962

Authorizing Signature: *Christine Treglia* Date: 2/1/18

**MAGIC MEDICAL, INC.**

Authorizing Signature: *Kelli Quilly* Date: 2/1/18

189.     Consistent with the DME fronts' financial records, the CS-3 has never

seen any invoices from "Magic Medical," even though it purportedly holds supplier

contracts with all of the Regency-established DME fronts in Tennessee.  The CS-3

has further advised that she has no contact information for anyone at "Magic

Medical," and has never spoken to or met anyone from the company.

190.     Another employee, who works in REGENCY's Largo location,

showed a similar unawareness regarding "Magic Medical."  The employee[19] had not

heard of "Magic Medical," even though, according to Florida corporate records, it

---

[19] This employee was interviewed in connection with an unrelated hotline complaint that he
submitted against REGENCY relating to a potential compromise of patient data.

supposedly maintains an office in the same building and on the same floor as REGENCY. The corporate records also identify WOLFE as Magic Medical's purported president and registered agent. The employee is one of WOLFE's direct reports.

### Fake Customer Records for Fake Patients

191.    In addition to the fake supplier contracts, the Regency conspirators also directed the CS-3 to place several fake "patient files" in a filing cabinet at each of the DME sites. The Regency conspirators emailed the CS-3 the fake patient files and advised that they were for review during on-site inspections. The files reflected false identifying information about the supposed patients, such as their birth dates, social security numbers, and addresses. They also generally reflected that the patient had visited the DME store and purportedly made a "cash" purchase of some type of a brace. All of this, however, was fake.

192.    The CS-3 explained that she has never seen any patients or brace customers at any of the Tennessee DME stores (including even after they received a Medicare billing ID). An FBI analyst, in turn, has reviewed the files, including, in particular, the identifying information about the supposed patients. The analyst concluded, based on the patient identifiers and addresses in the file, that these patients were actually fictitious—meaning they simply do not exist.

193.    The Regency conspirators' creation of and reliance on fake documents, including, in particular, for key on-site inspections to obtain Medicare billing

privileges, constitute false statements, which violate 18 U.S.C. §§ 1001 and 1035, and impede the lawful functioning of HHS.

### Some Tennessee DME Fronts Have Been "Sold" to Ever Prime

194.    The Ever Prime conspirators have expanded their network, with REGENCY's help, into Tennessee. Specifically, "Sunshine Medical Solutions" ("Sunshine") and STAR were established in Tennessee by the Regency conspirators for Ever Prime. For Sunshine, the CS-3 advised that her contacts were Burruss and Marcotti. Marcotti, as discussed previously, helps manage Ever Prime's fraudulent DME network.

195.    For STAR, an email from WOLFE to Burruss—and other evidence— reveals that Ever Prime controls the DME front. For example, in an email titled "Happy Friday," WOLFE sent Burruss a contract for STAR's straw owner, "Raquel Benavidez." (Benavidez is currently named as STAR's "owner" on Medicare documents.) WOLFE advised, "If you could get [the contract] as well as the payment and bank accounts that would be great. I am going to TN next week so if Raquel is initiated by then, I can get that one started." Financial records also show that Ever Prime controls STAR, as Ever Prime funneled money to Benavidez to fund STAR's bank account.

### REGENCY's Relationships/Schemes with the R&L Conspirators
### The Conspiracy between REGENCY and R&L MARKETING

196.    The CS-3 also provided information regarding REGENCY's business relationships—and schemes—with the R&L conspirators, RUFUS FRENCH and

LATEESE FORD. The R&L conspirators, as noted above, own R&L MARKETING, a lead-generation company in Mississippi. R&L's now-defunct website ("rnlmarketing.net") once openly offered "leads" for back braces, knee braces, and shoulder braces. Their website offered, "Expeditious Medical Brace Leads with rigorously verified customer data ensuring customer avidity and lead conversion efficiency." This offering is likely an appeal to fraudulent "marketers," who package fraudulent doctors' orders.

197. Financial records corroborate this. R&L MARKETING's bank account showed extensive financial ties with known fraudulent "marketers" involved in these DME schemes. Those "marketers" included companies listed in the "Active Marketer" section of the Ever Prime Address Book, such as Prizm and Unique. Prizm made numerous substantial payments, some well in excess of $100,000, to R&L MARKETING during the scheme. Similarly, Unique paid R&L MARKETING in excess of $24 million dollars, much of which can be traced back to fraudulent, Regency-established DME fronts in Ever Prime's control.

198. The R&L conspirators have also paid large sums of money to the Regency conspirators. In or around 2018, the R&L conspirators paid approximately $120,000 to WOLFE, and another $130,000 to POPPE. WOLFE and POPPE received some of these funds through their personal bank accounts.

199. These payments, in part, appear to be the cost of purchasing DME fronts from REGENCY, including at least one in Tennessee. The payments, however, may also relate to a new service offered by REGENCY: the CS-3 confirms

that Regency employees were directed to assist R&L MARKETING in screening prospective patients for "leads" for future brace orders – a function that signals a conscious disregard of medical necessity.  The scheme is discussed further below.

### The R&L Conspirators Purchased DME Fronts from REGENCY

200.    The R&L conspirators have purchased at least three DME fronts from the Regency conspirators, including one in Tennessee, as noted below:

| DME Front Name | Medicare ID | Reported Address |
| --- | --- | --- |
| Cherry Medical Supply | 7691160001 | 6148 Lee Hwy., Suite 116 Chattanooga, TN 37421 |
| Helpful Home Medical Supply, Inc. | 1982192225 | 99 NW 183rd St., Suite 205A North Miami Beach, FL 33169 |
| Paradise Medical Solutions, LLC (f/k/a Paradise Medical Solutions, Inc.) | 1225526569 | 18350 NW 2nd Ave., Suite 404 North Miami Beach, FL 33169 |

201.    Cherry Medical Supply ("Cherry"), Helpful Home Medical Supply ("Helpful Home"), and Paradise Medical Solutions ("Paradise") were all DME fronts established by REGENCY.  Corporate and Medicare records show that these DME fronts, or interests in these fronts, were then "sold" or transferred to the R&L conspirators and/or their associates.  Because Cherry is located in Tennessee, the CS-3 was able to provide additional information about its operations.

202.    According to the CS-3, Cherry was "sold" to R&L associate, Curtis French, as reflected in the public record.  Curtis French has close ties to the R&L conspirators and shares the same surname as RUFUS FRENCH.

203.    The CS-3 also learned that Cherry had other "investors," including, pertinently, LATEESE FORD.  FORD visited Cherry at its Chattanooga office.

While there, FORD ordered that "if anyone comes in asking questions, you know nothing." R&L paid the CS-3 a small monthly fee ($100) to ensure that Cherry's desk was covered at all times, particularly if its assigned administrative assistant was absent. Financial records confirmed that the payments to the CS-3 came from R&L MARKETING's bank account.

204. R&L's DME fronts have been the subject of numerous complaints. As the CS-3 learned, Cherry's administrative assistant reported that, since the "investors" took over (meaning since Cherry began billing Medicare), she has received returns and fielded patient complaints constantly. Patients apparently complained that they did not want or need the braces that Cherry had sent them.

205. This information is consistent with open-source complaints about other R&L-controlled DME fronts. For example, several consumers have complained, in effect, that Paradise "seem[s] to be running a scam on senior adults by sending miscellaneous orthotic parts to them and not accepting them back." Another consumer wrote: "[T]his company sent my dad some orthotics that he did not order." *See* https://npidb.org/organizations/suppliers/durable-medical-equipment-medical-supplies_332b00000x/1225526569.aspx (last accessed on March 14, 2019).

### REGENCY Directs Employees to Assist R&L's Operations

206. While DME fronts await Medicare inspections, the administrative assistants in Tennessee were typically idle, spending vast amounts of time watching Netflix or turning to other diversions. Consequently, the Regency conspirators saw

an opportunity to make their idle staff productive and actually profitable during this waiting period. This resulted in a so-called "entitlement screening" operation to help R&L MARKETING and others vet "leads." According to the CS-3, Regency conspirator LJ HILBERATH oversaw this operation.

207. R&L MARKETING promises its clients—mainly fraudulent "marketers" according to financial records—"rigorously verified customer data ensuring," importantly, "lead conversion efficiency." "Lead conversion efficiency" refers to the percentage of DME claims that Medicare will actually pay. A key obstacle to claim payment occurs when a Medicare beneficiary had received the same brace for the same body part within five years (which is the typical, durable life of a DME product). Medicare rules, in general, require denial of DME claims for redundant braces.

208. Given these rules, REGENCY administrative assistants were tasked to review the Medicare billing histories for prospective customers. The staff were directed to mark "P"—meaning "pass"—for any brace that had not been prescribed during the five-year-lookback period. Thus, DME claims for products marked "pass" would more likely result in paid Medicare claims. In sum, this would improve R&L's "lead conversion efficiency." This strategic, prospective vetting of beneficiaries' eligibility shows a conscious disregard of medical necessity and violates 18 U.S.C. § 1347 and other federal criminal laws.

209. The CS-3 approximated that, until recently, REGENCY staff were completing approximately 800 to 900 "entitlement checks" per day. In early March

2019, however, R&L MARKETING unexpectedly discontinued the program with REGENCY.  According to LJ HILBERATH, an R&L representative supposedly expressed dissatisfaction with the turnaround time for the screening.

## TRUGLIAS' FRAUDULENT DME NETWORK

210.   PATSY TRUGLIA, a multiple time convicted felon, and his wife, CHRISTINE TRUGLIA, are also REGENCY clients.  During the scheme, the Regency conspirators established and sold DME fronts to the TRUGLIAS in the Middle District of Florida and elsewhere, including as follows:

| DME Front Name | Medicare ID | Reported Address |
|---|---|---|
| Cordial Medical Supply | 7714870001 | 2435 US Highway 19, Suite 135 Holiday, FL 34691 |
| Indian Shores Bracing, Inc. | 7681610001 | 19823 Gulf Boulevard, Suite A Indian Shores, FL 33785 |
| Self-Care Bracing, Inc. | 7690030001 | 18350 NW 2nd Ave., Suite 406D Miami Gardens, FL 33169 |
| Village Medical Supply, Inc. | 7714230001 | 11380 66th St. North, Suite 138 Largo, FL 33773 |

211.   The Regency conspirators established and/or secured billing rights for the above DME fronts for the TRUGLIAS.  In doing so, the parties intentionally concealed PATSY TRUGLIA's ownership stake, knowing it could present an obstacle during Medicare enrollment.

212.   As a convicted felon, PATSY TRUGLIA has reportable "Adverse Legal Actions" that should have been disclosed on Medicare enrollment applications.  They were not.  In fact, PATSY TRUGLIA does not appear anywhere on any of the enrollment documents.  His ownership stake—which exceeds the 5%

required for mandatory disclosure—was hidden from Medicare; instead, for public consumption, it was his wife's name reflected on official records.[20]

213.    While such concealment alone constitutes a crime, the TRUGLIAS are engaged in far more, and far more lucrative, criminal conduct in the scheme. Between July 2018 and March 2019, the TRUGLIAS' DME fronts have submitted over $18.7 million in fraudulent DME claims to Medicare, with approximately $8.9 million paid.

### The TRUGLIAS Purchase "Turn-Key" DME Fronts from WOLFE

214.    The TRUGLIAS became "turn-key" DME front clients of REGENCY with the formation of Indian Shores Bracing, which is within the Middle District of Florida.  Corporate records for Indian Shores Bracing were filed on January 16, 2018, and it eventually secured Medicare-billing privileges on July 5, 2018.  Within days of each of these events, PATSY TRUGLIA wired $30,000—which is WOLFE's customary fee—to REGENCY.

215.    The first $30,000 wire came from PATSY TRUGLIA's known fraudulent "marketing" company, Global One.  Emails confirmed Global One, which PATSY TRUGLIA operates, as another fraudulent "marketer" selling bogus "doctors' orders" in the DME scheme.  For example, in an October 2017 email, an

---

[20] Florida corporate records show "Christine Truglia" as the sole officer for all four DME fronts. Medicare records reflect the same for three of the four.  WOLFE, however, remains, perhaps inadvertently, the named owner/manager of Self-Care Bracing.  Notwithstanding, Florida corporate filings, emails, and financial records—which show well over $400,000 transferred to PATSY TRUGLIA's company, ASP—support that Self-Care Bracing is controlled by the TRUGLIAS.

Ever Prime associate referred to PATSY TRUGLIA as Global One's main

contact/decision-maker. The email also set forth details about Global One's lead

pricing, which ranged from $100 to $300 per brace. Notably, Burruss,

WILLIAMSKY, and LEVIT were all included on this email.

216.   The second $30,000 wire to REGENCY came from another

TRUGLIA company, ASP Marketing. The wire was sent on or about July 9,

2018—meaning approximately four days after Indian Shores secured Medicare-

billing privileges. The wire information reflected: "Patsy Truglia, Coral Springs,

Florida." PATSY TRUGLIA, historically, was disclosed on ASP's public corporate

records; his name was removed when, it appears, PATSY TRUGLIA was on federal

probation for a money-laundering conviction. ASP was then placed in his mother's

name, Mary Truglia.

217.   PATSY TRUGLIA knew, as an experienced fraudulent "marketer" in

the scheme, the ease of the fraud and its vast monetary rewards. For example,

Indian Shores, in its first full month as a Medicare-approved DME provider, was

paid over $440,000 for DME claims.

218.   Knowing the profits that lie ahead, PATSY TRUGLIA emailed

WOLFE on June 1, 2018 asking if she "had anymore ready for purchase," meaning

other DME fronts. She did.

219.   Over the next few months, WOLFE and the Regency conspirators sold

the TRUGLIAS three more DME fronts: Self-Care Bracing, Cordial, and Village.

(Cordial and Village are in the Middle District of Florida.) These transactions are

reflected in public corporate filings for the DME fronts; they are also corroborated by financial payments. Specifically, at or around the time when the TRUGLIAS acquired Self-Care Bracing and Cordial, they sent WOLFE or REGENCY at least an additional $120,000, according to available banking records.[21] The payments appear to represent the $60,000-per-front fee that WOLFE customarily collects.

### Emails Confirm PATSY TRUGLIA's Ownership

220. The above payments support that, by Medicare's definition (which requires a mere 5% stake), PATSY TRUGLIA is an owner, if not the controlling owner, of the above-noted DME fronts. Emails add confirmation.

221. During the scheme, WOLFE corresponded with PATSY TRUGLIA on numerous occasions regarding DME fronts and related business matters. For example, in April 2018, PATSY TRUGLIA sent WOLFE several emails requesting status updates for Indian Shores Bracing. In response, WOLFE sent him several assurances, including to advise that REGENCY was checking approval status daily. WOLFE also, notably, asked PATSY TRUGLIA whether she could continue to refer him to new customers for "leads," likely meaning from his fraudulent "marketing" companies.

222. In July 2018, PATSY TRUGLIA continued asking WOLFE if new DME fronts were for sale. For example, in an email dated July 10, 2018, subject line "Miami DME," PATSY TRUGLIA asked WOLFE if there were "any other DMEs

---

[21] Village did not enroll in Medicare until on or about December 20, 2018; investigators have thus requested more recent bank records to track potential additional payments for that exchange.

available for purchase." WOLFE apparently promptly made the inventory available,

selling three more DME fronts to the TRUGLIAS within a few months.

### Claims Data and Patient Complaints

223.    Claims data for the TRUGLIAS' DME fronts reveal several badges of

fraud. Indian Shores Bracing is discussed below for illustration. Data points for the

other three DME fronts (Village, Self-Care, and Cordial) are set forth after this

discussion.

224.    Indian Shores Bracing, in its short existence, has had over 2,926

unique Medicare beneficiaries, 95% of whom live outside of Florida. Claims data

also showed that there were relatively few referring physicians per state—meaning,

patient encounters could only reasonably be explained through telemedicine. As

noted previously, these DME schemes commonly rely on "telemedicine" (or perhaps

the excuse of telemedicine, as many beneficiaries related in hotline complaints).

225.    A searching review of claims data revealed, however, that

"telemedicine" cannot be implemented for vast numbers of Indian Shores' claims.

Indian Shores' most billed (and most paid) product is a knee brace referenced by

HCPCS Code "L1851" (the "L1851 Knee Brace"). While many off-the-shelf

orthoses can be prescribed via telemedicine, the L1851 Knee Brace cannot. This

product requires an in-person, physical examination. Those in-person examinations

likely never happened, particularly given that Indian Shores submitted L1851 Knee

Brace claims for over 1,900 beneficiaries. It is particularly unlikely given the low

referring-physician-to-beneficiary ratio noted previously.  For such claims, Indian Shores took over $2.4 million from Medicare.

226.   These staggering figures are seen across-the-board for the TRUGLIAS' other DME fronts:

    a.   For Self-Care Bracing, over 97% of its 1,691 unique beneficiaries live outside of Florida.  And, again, claims data showed a relatively low referring-physician-to-beneficiary ratio.  Notwithstanding, Self-Care Bracing was paid in excess of $1.2 million for claims for the L1851 Knee Brace.

    b.   For Village, over 99% of its 374 unique beneficiaries live outside of Florida.  Again, the referring-physician-to-beneficiary ratio remained low.  Despite such factors, Village still received over $250,000 from Medicare for L1851 Knee Brace Claims for 263 beneficiaries.

    c.   For Cordial, over 99% of its 370 unique beneficiaries live outside of Florida.  Again, the referring-physician-to-beneficiary ratio remained low.  Despite such factors, Cordial still received over $260,000 from Medicare for L1851 Knee Brace Claims for 263 beneficiaries.

227.   The above is consistent with patient feedback—or rather patient complaints.  HHS-OIG's complaint hotline has received at least 60 recorded complaints from patients about the TRUGLIAS' DME fronts.  The public domain reflects many more unhappy "customers."  (For example, Indian Shores Bracing was

graded an "F" according to the Better Business Bureau's website, which reported yet more patient complaints.)

228. As an example of the abusive practices of Indian Shores, in January 2019, Medicare received a complaint from the son of a Medicare beneficiary that resided in Tennessee. The complainant characterized such practices that prompted their complaint as "unethical" and being "wasteful of tax dollars" relating to Indian Shores.

229. The reported, abusive practices involved, for example, the receipt of multiple unwanted and unnecessary braces as well as repeated calls pitching yet more braces, a tactic that defies Medicare's prohibition on cold-calling.

230. Given the totality of the above, the TRUGLIAS, through their network of fraudulent DME fronts, have lied to Medicare in furtherance of a scheme to defraud the Medicare program through the submission of fraudulent DME claims, in violation of 18 U.S.C. §§ 1035 and 1347.

## Medicare Claims Data – All Defendants

231. The government has collected Medicare claims data for amounts paid to the Regency-established DME fronts for DME claims. Together, the Regency-established DME fronts have submitted claims to Medicare in excess of $345 million, and have received in excess of $183 million from Medicare, from August 2017 to March 12, 2019. This is further divided as to the other Defendant and non-party conspirator groups below.

74

232.    From July 2018 to March 12, 2019, the TRUGLIAs' DME fronts have submitted claims to Medicare in excess of $18.7 million, and have received in excess of $8.9 million.

233.    From October 2018 to March 12, 2019, the R&L Conspirators' DME fronts have submitted claims to Medicare in excess of $8.5 million, and have received in excess of $4.2 million.

234.    From May 2018 to March 12, 2019, the WILLIAMSKY/LEVIT DME fronts have submitted claims to Medicare in excess of $9.9 million, and have received in excess of $5.2 million.

235.    From December 2017 to March 12, 2019, Regency-established DMEs in the Ever Prime Network have submitted claims to Medicare in excess of $308.5 million, and have received in excess of $165.5 million. This includes Medicare claims submitted by STAR, which is affiliated with the Ever Prime Network. From October 2018 to March 12, 2019, STAR submitted claims to Medicare in excess of $6.1 million, and has received in excess of $2.9 million.

236.    These figures are based on the United States' investigation to date and financial analysis that is ongoing. The evidence uncovered in the investigation shows that all of these claims were tainted by the payment of unlawful kickbacks, were made by companies who were approved to participate in Medicare based on false and fraudulent enrollment documents, and/or were for DME that was not medically necessary or was not actually provided to beneficiaries.

## DISSIPATION OF ASSETS

237.   From December 2017 to March 12, 2019, Medicare deposited over $183 million into the corporate accounts of the Regency-established DME fronts, in payment for the fraudulent claims for DME submitted by the DME fronts.

238.   Defendants and their co-conspirators have dissipated these assets by transferring these Medicare monies to themselves and each other, both directly and by using sham transactions to other companies they control.  Some examples include:

a. Ace Medical Supply, a Regency-established DME front controlled by WILLIAMSKY/LEVIT, received Medicare payments to its bank account at Chase Bank.  WOLFE was the only authorized signor on this account.  In May and June 2018, this account sent multiple wire transfers to a fraudulent marketing company (Empire Pain Center Holdings), totaling over $273,000.   This account also issued a $15,000 check to REGENCY in December 2017, and sent a $30,000 wire transfer to WOLFE and REGENCY in June of 2018.  In 2018, there were also multiple wire transfers from this account to WILLIAMSKY's company D2D Power Sales Inc., each ranging from $15,000 to $35,000.

b. American Bracing, a Regency-established DME front in the Ever Prime Network, received Medicare payments to its bank account at Chase Bank.  WOLFE is a signatory on the account.  Between November 8, 2017 through October 31, 2018, $1.035 million was transferred from

this account (via check and wire transfer) to Elite Healthcare Solutions, ostensibly for "marketing" expenses.

c. REGENCY has an account at Wells Fargo, on which WOLFE is a signatory. Between January 13, 2017 and October 25, 2018 REGENCY paid WOLFE over $1.07 million in checks from this account. This is in addition to biweekly direct deposits, typically around $2,000, to WOLFE from REGENCY from the same account. REGENCY also made frequent large payments (between $5,000 and $15,000) via check to KOEHLINGER from this account.

d. WOLFE has an account at BB&T, which contains funds she has received from her fraudulent REGENCY business. She has used this money to purchase a waterfront home, a boat, private school tuition for her son, among other personal items. WOLFE has also used this account to make payments to POPPE and HILBERATH. Frequently checks to POPPE would reference specific DME Fronts in the memo line.

e. POPPE, in turn, deposited checks received from WOLFE into his account at Chase Bank. POPPE also received checks from DME fronts and their straw or nominee owners, which he would deposit into his Chase Bank account. POPPE made multiple large cash withdrawals (i.e. between $4,800 and $14,900 at a time) from this account.

    f.  FORD is the only signor on the Renasant Bank Account for Paradise Medical Solutions, a Regency-established DME front. In January and February of 2019, FORD wired himself over $40,000 from this account

    g.  CHRISTINE TRUGLIA is the signor on the account for Indian Shores Bracing at Bank of America. Between October 15, 2018 and December 28, 2018, multiple wire transfers were sent from this account to ASP Marketing, a company controlled by the TRUGLIAs. The amounts transferred to ASP during this short period of time were more than $1.6 million.

    h.  STAR has an account at JP Morgan Chase. STAR made various payments to REGENCY, including a $30,000 payment via check. Additionally, in October 2018, STAR paid $42,349.38 via check from this account to BMW of San Diego, with "Raquel Benavidez" on the memo line (Benavidez, as discussed above, is the straw owner of STAR).

239.    From December 2017 to the present, Defendants have systematically dissipated the vast majority of the funds received from Medicare by writing checks and making transfers from corporate accounts in their control to themselves, to other entities they control, and to third parties to pay for real estate, personal luxury items, and other personal expenses.

240.    Although Medicare has paid the Regency-established DME fronts over $183 million since December 2017, the United States has only been able to locate assets totaling a fraction of that amount.

241.    Defendants have dissipated millions of dollars in Medicare funds, and unless enjoined, will continue to dissipate the proceeds of the fraud, or assets of equivalent value.

**COUNT I**
(18 U.S.C. § 1345 – Injunctive Relief)

242.    The United States realleges and incorporates by reference paragraphs 1 through 241 of this Complaint as though fully set forth herein.

243.    Among other things, the Defendants committed and are committing a Federal health care offense, as defined in 18 U.S.C. 24, by having engaged and continuing to engage in a conspiracy to violate, and violating, 18 U.S.C. § 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and pay and receive kickbacks in connection with a federal health care benefit program), 18 U.S.C. § 1035 (making false statements relating to health care matters), 18 U.S.C. § 1001 (false statements), and 42 U.S.C. § 1320a-7b(b), also known as the "Anti-Kickback Statute" (paying and receiving illegal healthcare kickbacks).

244.    Defendants have already dissipated millions of dollars in proceeds of the fraud, and intend to continue dissipating the remainder of the proceeds of the fraud.

245.   Defendants' fraud upon Medicare is a fraud against the United States and constitutes a continuing and substantial injury to the United States and its citizens.

246.   The United States brings this action to protect Medicare by restraining Defendants' unlawful fraudulent conduct and to protect and restrain the transfer of funds and assets now in Defendants' hands that are the ill-gotten gains of the fraud perpetrated upon the Medicare program or assets of equivalent value.

247.   Upon a showing that Defendants are committing or about to commit a Federal health care offense, the United States is entitled, under 18 U.S.C. §§ 1345(a)(1), to a temporary restraining order, a preliminary injunction, and a permanent injunction, restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

248.   Upon a showing that Defendants are alienating or disposing, or intend to alienate or dispose, property obtained as the result of a Federal health care offense, the United States is entitled, under 18 U.S.C. §§ 1345(a)(2), to a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining defendants from alienating, withdrawing, transferring, removing, dissipating, or disposing of any property obtained as a result of a Federal health care offense, property traceable to such violation, or property of equivalent value.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff United States of America prays that this Court issue a Temporary Restraining Order and Preliminary Injunction in this matter against Defendants, and that a permanent injunction shall be issued forthwith, that orders Defendants, their agents, servants, employees, attorneys, and all persons acting in concert and participation with Defendants, including all corporations over which they exercise control, be enjoined as follows:

1. From making or conspiring to make any false claim to the Medicare Program or any federal health care benefit program, or otherwise from committing any Federal health care offense, as defined in 18 U.S.C. § 24;

2. From withdrawing or transferring any moneys or sums presently deposited, or held on behalf of Defendants by any financial institution, trust fund, or other financial agency, public or private, that are proceeds from false, fictitious, or fraudulent claims made by Defendants, or any moneys of equivalent value to those taken through false, fictitious, or fraudulent claims;

3. From transferring, selling, assigning, dissipating, concealing, encumbering, impairing, or otherwise disposing of, in any manner, assets, real or personal;

4. To preserve all business, financial, and accounting records, including bank records, that detail Defendants' business operations and disposition of any payment that directly or indirectly arose from the payment of

money to Defendants or to any entity in which Defendants have an
ownership interest on behalf of Medicare;

5. To preserve all medical records, including patient records, which relate to
Defendants' business operations and/or to services for which claims were
submitted to Medicare;

6. To provide an accounting of all assets, within seven calendar days, that
includes suitable reports detailing Defendants' financial condition and the
financial condition of any entity in which Defendants have a direct
financial interest;

7. To complete a Financial Disclosure Statement form provided to
Defendants by the United States within seven calendar days;

8. For disgorgement and restitution of all of Defendants' ill-gotten gains
attributable to their fraud upon the United States; and

9. For such other and further relief as the Court shall deem just and proper.

Dated: April 4, 2019

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

*Carolyn B. Tapie*

CAROLYN B. TAPIE
Assistant United States Attorney
USA No. 190

SEAN P. KEEFE
Assistant United States Attorney
Florida Bar No. 0413828
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6198
Email: Carolyn.B.Tapie@usdoj.gov
*Counsel for United States*